STATE of Wisconsin, Plaintiff-Respondent,

v.

AMOCO OIL COMPANY, a foreign corporation, Defendant-Appellant.

Supreme Court

*No. 77–065. Argued September 11, 1979.—*
*Decided June 27, 1980.*
(Also reported in 293 N.W.2d 487.)

---

[8] *Compare,* Restatement, *Contracts,* §486 (1932).

For the appellant there were briefs by *Quarles & Brady*, attorneys, *Stuart Parsons* and *Thomas Armstrong*, of counsel, and oral argument by *Mr. Parsons*, all of Milwaukee.

For the respondent the cause was argued by *James D. Jeffries*, assistant attorney general, with whom on the brief was *Bronson C. La Follette*, attorney general.

SHIRLEY S. ABRAHAMSON, J.   The State of Wisconsin commenced this action to enjoin Amoco Oil Company from continuing its advertising program offering "combination sales," allegedly in violation of sec. 100.18 (2), Stats., which prohibits the selling or furnishing of

any property or services combined with or conditioned on the purchase of any other property or services without setting forth the total price to be paid.[1] Amoco asserts that its advertisements comply with the requirements of sec. 100.18(2), Stats., and challenges the constitutionality of sec. 100.18(2) on the grounds that sec. 100.18(2) has been preempted by federal law and that sec. 100.18(2) constitutes an undue burden on interstate commerce, contravenes Amoco's first amendment rights and violates due process guarantees. The parties entered into a stipulation of facts, and each filed a motion for summary judgment. The circuit court in a well-reasoned and well-documented opinion upheld the validity of the statute and entered judgment enjoining Amoco from "advertising or otherwise representing the sale or furnishing of any property or services combined with or conditioned on the purchase of any other property or services without clearly and conspicuously setting forth the total price or amount in such advertisement or other representation." We affirm the judgment of the circuit court.

## I.

The facts giving rise to this litigation are not in dispute. Amoco Oil Company, a wholly owned subsidiary of Standard Oil Company, an Indiana corporation, is a Maryland corporation doing business in the State of Wisconsin with its principal office and place of business in Chicago, Illinois. Virtually all Standard Oil stations

[1] Sec. 100.18(11)(d), Stats., authorizes the Wisconsin Department of Justice to commence an action to restrain a violation of sec. 100.18(2), Stats. Sec. 100.18(11)(d), Stats., states: "(d) The department or the department of justice or any district attorney, upon informing the department of justice, may commence an action in circuit court in the name of the state to restrain by temporary or permanent injunction any violation of this section. . . ."

in Wisconsin are operated through independent dealers. Amoco sells, in addition to other products, automobile parts and accessories to independent Standard Oil dealers at wholesale for resale to consumers. Amoco has no authority to require an independent dealer (1) to participate in promotional programs of the kind involved in this litigation, (2) to purchase or offer for sale any of the products involved in the promotional programs, or (3) to resell any product involved in the promotional programs at any particular price.

Beginning in the spring of 1973 and continuing through 1975, Amoco used newspapers, national magazines, television, radio and direct mailings to promote the sale of tires. Although there were several kinds of promotions, in the ones with which we are concerned, the consumer was offered "free" goods or services in conjunction with the purchase of tires. It is this common feature of the promotions, the "combination sale," which brought into question the applicability of sec. 100.18 (2), Stats.

In 1973, Amoco's newspaper advertisements in Wisconsin offered 50 gallons of gasoline free with the purchase of four Atlas tires and 25 gallons of gasoline free with the purchase of two tires. Nine styles of tires were shown in the advertisement, but no prices were stated. The advertisement advised the reader: "So see your participating Standard Dealer now." In 1974, newspaper advertisements were published listing "Sale Prices" for tires plus "great gifts." Some advertisements gave prices for the tires. The advertisements ended with the suggestion, "Check your participating dealer," and with the comment, "Prices may vary from dealer to dealer." Amoco apparently wrote to each dealer participating in these promotions requesting the dealer to post the prices which the dealer was charging for the tires involved in the program. The prices posted by the dealer, pursuant to Amoco's request, are referred to by the parties as point-of-sale or point-of-purchase displays.

In 1975, Amoco used newspapers, television, direct mailings to credit card holders, and national magazines such as Time, Newsweek and Sports Illustrated, to advertise a "combination sale" of tires and a free four-month gift membership in the Amoco Motor Club. The participating dealers were asked by Amoco to post prices of the tires which were part of the promotional program. The direct mail and national magazine advertisements did not disclose the prices of the tires and did not refer to the point-of-sale displays. The television advertisements did not disclose the prices of the tires, but a statement was superimposed on the screen saying "Prices for all tire sizes are posted at participating dealers." The newspaper advertisements included a suggested retail price for the featured tires for the particular market served by the respective newspaper and also included the statements, "Actual sale price by participating dealer may vary from dealer to dealer," and "Look for this sign at participating Standard Dealers."

Amoco considered it impractical to include prices for all the market areas in state-wide advertisements, and separate versions of the advertisements for different market areas within the state would have increased the advertising costs considerably. Amoco considered it unrealistic to disclose the tire sizes and prices in television and radio advertisements because of the size of the market reached and the limitations of time in radio advertisements and of time and space in television advertisements.

Amoco could have sent a special version of the direct mail advertisement to Wisconsin credit card holders, at an estimated minimum extra cost of $5,000 and could have obtained separate national magazine advertisements for Wisconsin at an estimated minimum extra cost of $5,000 per magazine edition.

Representatives of Amoco and the State of Wisconsin have over the years attempted to resolve their differences relating to the application of sec. 100.18(2), Stats., to

Amoco's promotional programs. At a meeting in October, 1975, Amoco's representatives stated that Amoco had fashioned its 1975 advertisements to "meet the Department of Agriculture's views as Amoco understood them to have been developed in the previous communications about the 1974 program." Representatives from the Wisconsin Department of Justice asserted that Amoco's advertisements did not meet the requirements of sec. 100.18(2), Stats., and suggested that a lawsuit alleging violation of sec. 100.18(2), Stats., could be avoided if Amoco signed a voluntary assurance against future violations. On or about October 15, 1975, Amoco advised the State of Wisconsin that it declined to sign a voluntary assurance against further violations. The State commenced this action on October 31, 1975.

The circuit court found that Amoco's advertisements failed to state the price or amount the purchaser would have to pay in order to receive the purchased goods and the free property or services and concluded as a matter of law that the advertisements violated sec. 100.18(2), Stats. ·

## II.

Amoco asserts that its advertisements satisfy the requirements of sec. 100.18(2), Stats. Sec. 100.18(2), Stats. requires that the price or amount to be paid in a "combination sale" must be set forth clearly, conspicuously and in such manner that the total price or amount to be paid may be readily ascertained. Sec. 100.18(2), Stats., states:

"(2) In advertising or otherwise representing the sale or furnishing of any property or services combined with or conditioned on the purchase of any other property or services described in such advertisement or other representation, it is deceptive to fail to state the price or

amount which must be paid for the property or services included in such sale, along with any other requirement which is a condition to the receipt of such property or services. The price or amount which must be paid shall be set forth clearly, conspicuously and in such manner that the total price or amount to be paid may be readily ascertained."

Amoco maintains that its advertisements standing by themselves, satisfy sec. 100.18(2), because they inform the consumer of the basic terms of the promotional program, including information about the tires, the "free goods and services," and the price, by revealing that the actual prices are posted by the participating dealers and that the actual retail prices might vary from any price stated in the advertisement. Because Amoco has no control over the price charged by the dealer and the dealer's prices vary within a market area and from market area to market area, Amoco claims that its advertisements could not quote the actual price of the tires in the combination sale. Amoco asserts that it complied with sec. 100.18(2), Stats., because it, a manufacturer-supplier whose advertisements reach persons in several market areas, told the consumer as much as it possibly could about the promotional sale.

Amoco also argues that its advertisements, taken together with the point-of-sale displays at each dealer's premises, clearly informed the consumer, in advance of purchase, of the total price to be paid as required by sec. 100.18(2), Stats. Thus Amoco contends that its advertisements, integrated with the point-of-sale displays, satisfy the basic requirements of sec. 100.18(2), because the two advertisements together set forth the total price. We conclude, as did the circuit court, that sec. 100.18(2), Stats., requires that the actual price or amount which is to be paid for the property sold must be included in the advertisement itself.

Amoco's construction of sec. 100.18(2) to validate its advertisements standing alone or its advertisements in combination with the dealer's point-of-sale displays not only does violence to the language of the statute but also undermines the purpose of the statute. Sec. 100.18(2) does not provide that multiple advertisements read together can supply the price or amount to be paid. The statute requires that the price be stated "in advertising" and that "the price or amount which must be paid shall be set forth clearly, conspicuously and in such manner that the total price or amount to be paid may be readily ascertained." We read this language to mean that the actual prices must be readily available to the consumer in the advertisement which offers the combination sale.

If we were to accept Amoco's contention that the requirements of sec. 100.18(2) are met by integrating Amoco's advertisements with point-of-sale displays, the legislative purpose in enacting sec. 100.18(2) would be defeated.

It is apparent that the purpose of sec. 100.18(2), Stats., is to promote full disclosure to the consumer of reliable data, thereby preventing deceptive pricing and facilitating price comparison. The draftsman's explanatory comment to sec. 100.18(2), Stats., was that the section was "designed to more effectively smoke out actual deceptions." Legislative Reference Bureau file, Ch. 44, Laws of 1961. Combination sale advertising justifies special legislative treatment because of the unique appeal to the consumer of a "free" item and the potential for deception because the participating dealer's usual price for the purchased goods may be at the high end of the price range or the dealer may have manipulated the price of the purchased item.

The theory of sec. 100.18(2) is that the consumer, supplied with sufficient and accurate information, can evaluate the advertisement and make an intelligent, rational

decision and that the advertiser should supply the information, the consumer should not have to search for it.[2] Sec. 100.18(2), Stats., enables the consumer to gauge from the advertisement itself whether the "gift" is "free" or whether the consumer is financing the "gift" in whole or in part by paying a high price for the merchandise to be purchased. Sec. 100.18(2) enables the consumer to determine the price of the merchandise before he or she is enticed into the business premises of the seller by the advertisement of "free" goods. If the consumer must go to the business premises of the dealer for the prices, the consumer is put in a position in which the retailer may exert pressure, the consumer may feel compelled to make an immediate decision, and the consumer cannot reflect or make comparisons. *Ohralik v. Ohio Bar Assn.*, 436 U.S. 447, 457 (1978).

Even if all of Amoco's advertisements could be interpreted as clearly advising the consumer that actual prices for the tires vary from dealer to dealer and the actual prices are posted by the participating dealer, we conclude that Amoco's "integrated ad" does not fulfill this legislative purpose, because Amoco's advertisements, combined with the point-of-sale displays, do not inform the consumer of the price of tires in advance of his or her going to the seller's business premises. Point-of-sale price disclosures decrease the consumer's opportunity to evaluate the offer to detect a high priced dealer or price manipulation.

Amoco asks that manufacturers and suppliers be excepted from sec. 100.18(2), Stats. We believe that construing sec. 100.18(2) as being inapplicable to manufac-

---

[2] For an evaluation of disclosure requirements, *see* Whitford, *The Functions of Disclosure Regulation in Consumer Transactions*, 1973 Wis. L. Rev. 400.

turers or suppliers defeats the purpose of the act. Amoco repeatedly argues that "It makes no apparent sense to deny Amoco access to Wisconsin consumers (who probably want to know where they might be able to buy tires cheaper) solely because Amoco sells only to independent dealers and therefore cannot announce precisely the actual retail price." If Amoco were excluded from the coverage of sec. 100.18(2), the consumer would be enticed to go to the dealer without being alerted to the price to be charged by the dealer. The dealer could be charging a relatively high price for the property or services required to be purchased as a condition of obtaining the "free" property or services. Amoco would be inducing consumers into this dealer's station without giving them fair warning. Such an Amoco dealer would enjoy an unfair advantage over a competing retailer who, complying with sec. 100.18(2), Stats., would have to alert the potential consumer to its price for the goods purchased before the consumer went to the premises. We agree with the state's position that not only do the statutory terms apply to Amoco, but that they should apply to Amoco if they are to operate effectively. If Amoco wishes to offer combination sales, it can encourage its local retail dealers to place advertisements which state the price or amount.

Accordingly, we hold, as did the circuit court, that Amoco's combination sale promotional advertising violates sec. 100.18(2), Stats. We turn now to Amoco's challenges to sec. 100.18(2), Stats., as violating the federal constitution.

### III.

The Federal Trade Commission Act (FTCA), 15 USC sec. 45(a)(1), provides that "Unfair methods of competition in commerce, and unfair or deceptive acts or

practices in commerce, are declared unlawful." Amoco, relying on the FTCA, challenges the constitutionality of sec. 100.18(2), Stats., under the supremacy clause of the federal constitution which declares that the federal law "shall be the supreme law of the land." U. S. Const., art. VI, cl. 2.

Congress can preempt a field either by express statutory command or by implicit legislative design. *Malone v. White Motor Corp.*, 435 U.S. 497, 504 (1978). When a state law is challenged under the supremacy clause, we "start with the assumption that the historic police powers of the states were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). *See also Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977); *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 157 (1978).

Amoco does not argue that the FTCA expressly preempts state law or standing alone implicitly preempts sec. 100.18(2).[3] Amoco argues that the FTCA inter-

---

[3] The FTCA and the legislative history of the FTCA prior to 1975 are silent on the question of preemption. In *Parker v. Brown*, 317 U.S. 341 (1943), the United States Supreme Court held that the Sherman Act did not preempt a state regulatory scheme and counseled against attributing lightly to Congress the intent to preempt state laws in the antitrust field.

The legislative history of the 1975 amendments to the FTCA indicates that Congress did not intend to occupy the field of consumer protection regulation. Verkuil, *Preemption of State Law by the Federal Trade Commission*, 1976 Duke L.J. 225, 227–243 (1976); Davidson & Butters, *Parker & Usery: Portended Constitutional Limits on the Federal Interdiction of Anticompetitive State Action*, 31 Vand. L. Rev. 575, 576–582 (1978); *Developments—Deceptive Advertising*, 80 Harv. L. Rev. 1005, 1134–1139 (1967). Courts have consistently held that Congress did not intend that the FTCA supersede the states' police power in the area of unfair or deceptive competition or practices. *See, e.g.,*

preted through the Federal Trade Commission (FTC) Guides implicitly preempts sec. 100.18(2), Stats., because both the federal Guides and the state law operate in the field of combination sales advertising by tire manufacturers and suppliers. As we shall discuss later, the Guides do not have the force and effect of law and they are not comprehensive in nature. Nor is the scheme of federal regulation set forth in the Guides so pervasive as to make reasonable the inference that Congress intended to exclude state legislation. *Kaski v. First Federal S & L Assn.*, 72 Wis.2d 132, 139, 240 N.W.2d 367 (1976). We therefore conclude that Congress has not preempted sec. 100.18(2), Stats., by express statutory command or by implicit legislative design.

■

Although the existence of the FTCA does not exclude all state legislation in the same field, a state law will be preempted "because of a square conflict with a particular provision of federal law or because of general incompatibility with basic federal objectives." *Philadelphia v. New Jersey*, 437 U.S. 617, 621 n. 4 (1978). *See also Ray v. Atlantic Richfield Co., supra*, 435 U.S. at 158; *Jones v. Rath Packing Co., supra*, 430 U.S. at 540–41; *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). Amoco asserts that there is a "square conflict" between sec. 100.18(2),

*People ex rel. Mosk v. National Research Co. of Cal.*, 20 Cal. Rptr. 516, 524, 201 C.A.2d 765 (1962); *People v. Arthur Murray, Inc.*, 47 Cal. Rptr. 700, 708, 238 C.A.2d 333 (1965); *Holiday Magic, Inc. v. Warren*, 357 F. Supp. 20, 28 (E.D. Wis. 1973), vacated on other grounds, 497 F.2d 687 (7th Cir. 1974); *State v. Allied Chemical & Dye Corp.*, 9 Wis.2d 290, 295, 101 N.W.2d 133 (1960); *Bedno v. Fast*, 6 Wis.2d 471, 480, 95 N.W.2d 396 (1959).

For a discussion of the doctrine of preemption and the FTCA, *see* Badal, *Restrictive State Laws & The Federal Trade Commission*, 29 Adm. L. Rev. 239, 248–264 (1977).

For a general discussion of preemption, *see* Note, *The Preemption Doctrine, Shifting Perspectives on Federalism and The Burger Court*, 75 Colum. L. Rev. 623 (1975).

Stats., and the FTCA, as interpreted by the FTC Guides, and we must therefore determine whether the FTC Guides upon which Amoco relies can operate to preempt state law and whether sec. 100.18(2), Stats., conflicts with the FTC Guides.

To determine whether FTC Guides can operate to preempt state law we must understand the nature of these Guides under federal law.[4] Sec. 18(a)(1) of the FTCA, 15 USC sec. 57a (Supp. V 1975), clearly distinguishes between two types of FTC rules: interpretive rules with respect to unfair or deceptive practices and substantive rules defining unfair or deceptive practices. The pertinent part of sec. 57a defining the two types of rules states:

"Sec. 57a. Unfair or deceptive acts or practices rulemaking proceedings—Authority of Commission to prescribe rules and general statements of policy

"(a)(1) The Commission may prescribe—

"(A) interpretive rules and general statements of policy with respect to unfair or deceptive acts or practices in or affecting commerce (within the meaning of section 45(a)(1) of this title), and

"(B) rules which define with specificity acts or practices which are unfair or deceptive acts or practices in or affecting commerce (within the meaning of section 45(a)(1) of this title). Rules under this subparagraph may include requirements prescribed for the purpose of preventing such acts or practices."

The FTC Guides upon which Amoco relies are interpretive rules, not substantive rules. The FTC explains its industry Guides as follows:

"Industry guides are administrative interpretations of laws administered by the Commission for the guidance

---

[4] For a discussion of FTC Guides, *see* Asimow, *Public Participation in the Adoption of Interpretive Rules and Policy Statements*, 75 Mich. L. Rev. 520, 528 (1977); *Developments—Deceptive Advertising*, 80 Harv. L. Rev. 1005, 1088–1096 (1967).

of the public in conducting its affairs in conformity with legal requirements. They provide the basis for voluntary and simultaneous abandonment of unlawful practices by members of industry. Failure to comply with the guides may result in corrective action by the Commission under applicable statutory provisions. Guides may relate to a practice common to many industries or to specific practices of a particular industry. [16 CFR sec. 1.5 (1977)]

". . .

"Industry guides are promulgated by the Commission on its own initiative or pursuant to petition filed with the Secretary or upon informal application therefor, by any interested person or group, when it appears to the Commission that guidance as to the legal requirements applicable to particular practices would be beneficial in the public interest and would serve to bring about more widespread and equitable observance of laws administered by the Commission. . . ." 16 CFR sec. 1.6 (1977).

Although FTC Guides may be relied upon by the FTC and may be given great weight in prosecutions under 15 USC sec. 45, the Guides are interpretive. They are "guides, not fixed rules as such, and were designed to inform businessmen of the factors which would guide Commission decision." *FTC v. Mary Carter Paint Co.,* 382 U.S. 46, 48 (1965). The Guides "do not purport to be a concise statement of the present status of the law which the courts are bound to follow." *Allis-Chalmers Mfg. Co. v. White Consol. Indus. Inc.,* 414 F.2d 506, 524 (3d Cir. 1969), *cert. denied* 396 U.S. 1009 (1970). Guides, unlike substantive rules, do not have the force and effect of law; the Guides are not the equivalent of the statute. CCH Trade Regulation Reporter par. 9740. Substantive rules implement the statutes and have the force and effect of law, but interpretive rules apprise the public of the agency's construction of the statute. Davis, *Administrative Law* 126 (3d ed. 1972).

If a substantive rule is treated as having the same effect as the statute, then if there is a direct conflict between the substantive rule and a state law, the substantive rule, like a federal statute, arguably preempts the state law. See Note, *State Action Exemption and Antitrust Enforcement Under the Federal Trade Commission Act,* 89 Harv. L. Rev. 715, 738–743 (1976) ; Verkuil, *Preemption of State Law by the Federal Trade Commission,* 1976 Duke L.J. 225, 229–30; Davidson & Butters, *Parker and Usery: Portended Constitutional Limits on the Federal Interdiction of Anticompetitive State Action,* 31 Vand. L. Rev. 575, 580 (1978).

Amoco's conclusion that the FTCA, 15 USC sec. 45, as interpreted by the Guides, preempts sec. 100.18(2), rests on Amoco's erroneous assertion that "the FTC Act requires what the Guidelines [Guides] require." Amoco has mischaracterized the effect of the Guides and treats the Guides as substantive rules. Interpretive rules have persuasive effect, but do not have the force or effect of law. Amoco has failed to cite any authority which has accorded the Guides or any administrative interpretive rules preemptive effect. We do not think that Guides, interpretive rules which do not carry the force and effect of law, pose a preemption issue under the supremacy clause.

In any event, as explained below, we conclude that sec. 100.18(2), Stats., does not conflict with the three FTC Guides which Amoco's briefs discuss. Conflict means "contradictory in the sense of legislative provisions that cannot coexist." *E. B. Elliott Advertising Co. v. Metropolitan Dade Co.,* 425 F.2d 1141, 1150 (5th Cir. 1970). This case does not present a situation "where compliance with both federal and state regulations is a physical impossibility for one engaged in interstate commerce."

*Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–143 (1963). We believe it is physically possible to comply with the state law requirement "without triggering federal enforcement action." *Jones v. Rath Packing Co.,* 430 U.S. 519, 540 (1977).

One Guide, 16 CFR Part 228, relates to tire advertising, and 16 CFR 228.15 deals with "deceptive pricing" in tire advertising. *See* CCH Trade Regulation Reporter par. 39,017. Subsection 228.15(h) governs tire advertising furnished to retail outlets by tire manufacturers and provides as follows:

"(h) *Advertising furnished by tire manufacturers.* It is the practice of some time manufacturers to supply advertising to independent as well as to wholly owned retail outlets in local trade areas. A tire manufacturer providing advertising material to be used in local trade areas by either wholly owned or independent outlets is responsible for the representations made in such advertising and should base price and savings claims on conditions actually existing in the particular areas. In view of price fluctuations at the local level, the general dissemination (i.e., in more than one trade area) to independent retail outlets of advertising material containing stated prices or reduction claims results in deception[1] and is, accordingly, contrary to this part." 16 CFR sec. 228.-15(h).

---

[1] "This part does not deal with the question of whether such practice may be improper as contributing to unlawful restraints of trade connected with the enforcement of the Antitrust Laws and the Federal Trade Commission Act."

This section declares it deceptive, in view of price fluctuations at the local level, for a manufacturer to state prices in advertising material disseminated to retailers in more than one trade area. The section on its face covers only disseminations which are "general." The section speaks to dissemination of advertising material by the manufacturer to the retailers. It is not clear whether the section governs the manufacturer's dis-

semination of advertising material to the consumer. Sec. 100.18(2), Stats., governs dissemination of advertising material to the consumer and requires prices be furnished to the consumer; sec. 100.18(2) does not require Amoco to furnish prices in combination sale advertising material supplied to retail outlets. Under the Wisconsin statutes Amoco could advertise its tires without stating a price as long as it did not offer free items in combination with the sale. The 1974 Amoco radio advertisements promoting a spring tire sale at favorable prices at the friendly neighborhood Standard dealer satisfied sec. 100.-18(2). If Amoco desired to promote combination sales, the dealers could place advertisements listing actual prices. Sec. 100.18(2) does not require that which 16 CFR sec. 228.15(h) forbids; it appears that Amoco can comply with both 16 CFR 228.15(h) and sec. 100.18(2), Stats., and that sec. 100.18(2), in requiring that accurate price information be furnished to the consumer, complements 16 CFR 228.15(h).

Amoco also argues that sec. 100.18(2), Stats., conflicts with the "Guides Against Deceptive Pricing," 16 CFR Part 233. 16 CFR 233.3 relates to advertising retail prices which have been established or suggested by manufacturers and provides in pertinent part as follows:

"(a) Many members of the purchasing public believe that a manufacturer's list price, or suggested retail price, is the price at which an article is generally sold. Therefore, if a reduction from this price is advertised, many people will believe that they are being offered a genuine bargain. To the extent that list or suggested retail prices do not in fact correspond to prices at which a substantial number of sales of the article in question are made, the advertisement of a reduction may mislead the consumer.

". . .

"(f) In other words, a retailer who advertises a manufacturer's or distributor's suggested retail price should be careful to avoid creating a false impression that he is

offering a reduction from the price at which the product is generally sold in his trade area. If a number of the principal retail outlets in the area are regularly engaged in making sales at the manufacturer's suggested price, that price may be used in advertising by one who is selling at a lower price. If, however, the list price is being followed only by, for example, small suburban stores, house-to-house canvassers, and credit houses, accounting for only an insubstantial volume of sales in the area, advertising of the list price would be deceptive.

"(g) On the other hand, a manufacturer or other distributor who does business on a large regional or national scale cannot be required to police or investigate in detail the prevailing prices of his articles throughout so large a trade area. If he advertises or disseminates a list or preticketed price in good faith (i.e., as an honest estimate of the actual retail price) which does not appreciably exceed the highest price at which substantial sales are made in his trade area, he will not be chargeable with having engaged in a deceptive practice. . . ." 16 CFR sec. 233.3 (a) (f) (g).

Amoco argues that sec. 100.18(2), Stats., requiring Amoco to set forth the total price, directly conflicts with sec. 233.3(g), quoted above, which states that a manufacturer who advertises a list or preticketed price in good faith which is an honest estimate of the actual retail price will not be chargeable with having engaged in a deceptive practice. 16 CFR sec. 233.3(g) deals with comparative price advertising, not combination sales. Comparative price advertising involves the comparison of a seller's present price with either the price of a competitor or the seller's former price. 16 CFR 233.3(g) is designed to guard against the deceptive use of an inflated "manufacturer's suggested retail price" as a comparison with the actual retail selling price for the same item. Sec. 100.18(2), Stats., is not concerned with comparative price advertising. Wis. Ag. Rule 124, Wis. Adm. Code, governs comparative pricing. While both sec. 100.-18(2), Stats., and 16 CFR 233.3 are concerned with de-

ceptive advertising, the state and federal provisions deal with different subjects. The two complement each other; they are not inconsistent.[5]

The third FTC Guide to which Amoco refers deals specifically with combination sales. 16 CFR Part 251 is entitled "Guide Concerning Use of the Word 'Free' and Similar Representations." *See* CCH Trade Regulation Reporter, par. 39,036. 16 CFR 251.1 provides in pertinent part:

"(a) . . .
"(2) Because the purchasing public continually searches for the best buy, and regards the offer of 'Free' merchandise or service to be a special bargain, all such offers must be made with extreme care so as to avoid any possibility that consumers will be misled or deceived. . . .

"(b) *Meaning of 'Free.'* (1) The public understands that . . . an offer of 'Free' merchandise or service is based upon a regular price for the merchandise or service which must be purchased by consumers in order to avail themselves of that which is represented to be 'Free.' In other words, when the purchaser is told that an article is 'Free' to him if another article is purchased, the word 'Free' indicates that he is paying nothing for that article and no more than the regular price for the other. Thus, a purchaser has a right to believe that the merchant will not directly and immediately recover, in whole or in part, the cost of the free merchandise or service by marking up the price of the article which must be purchased, by the substitution of inferior merchandise or service, or otherwise.

"(2) The term 'regular' when used with the term 'price,' means the price, in the same quantity, quality and with the same service, at which the seller or advertiser of the product or service has openly and actively sold the

---

[5] For a discussion of comparative price advertising, *see* 2 Kanwit, *Federal Trade Commission* sec. 22.18 (1979); Rollins, *Comparative Price Advertising*, 33 Bus. Lawyer 1771 (1978); Pitofsky, *Beyond Nader: Consumer Protection & The Regulation of Advertising*, 90 Harv. L. Rev. 661, 687–689 (1977).

product or service in the geographic market or trade area in which he is making a 'Free' or similar offer in the most recent and regular course of business, for a reasonably substantial period of time, i.e., a 30-day period. For consumer products or services which fluctuate in price, the 'regular' price shall be the lowest price at which any substantial sales were made during the aforesaid 30-day period. Except in the case of introductory offers, if no substantial sales were made, in fact, at the 'regular' price, a 'Free' or similar offer would not be proper.

"(c) *Disclosure of conditions.* When making 'Free' or similar offers all the terms, conditions and obligations upon which receipt and retention of the 'Free' item are contingent should be set forth clearly and conspicuously at the outset of the offer so as to leave no reasonable probability that the terms of the offer might be misunderstood. Stated differently, all of the terms, conditions and obligations should appear in close conjunction with the offer of 'Free' merchandise or service. For example, disclosure of the terms of the offer set forth in a footnote of an advertisement to which reference is made by an asterisk or other symbol placed next to the offer, is not regarded as making disclosure at the outset. . . .

"(d) *Supplier's responsibilities.* Nothing in this section should be construed as authorizing or condoning the illegal setting or policing of retail prices by a supplier. However, if the supplier knows, or should know, that a 'Free' offer he is promoting is not being passed on by a reseller, or otherwise is being used by a reseller as an instrumentality for deception, it is improper for the supplier to continue to offer the product as promoted to such reseller. He should take appropriate steps to bring an end to the deception, including the withdrawal of the 'Free' offer." 16 CFR sec. 251.1(a) (2), (b) (1) (2), (c), (d).

16 CFR 251.1 and sec. 100.18(2), Stats., are consistent and complementary. 16 CFR 251.1(c) states that in making a combination sale "all the terms, conditions and obligations . . . should be set forth clearly and conspicuous-

ly at the outset of the offer . . . . Stated differently, all of the terms, conditions and obligations should appear in close conjunction with the offer of 'Free' merchandise or service." Although the FTC Guide does not specifically require price disclosure, while sec. 100.18(2) does, the two sections have the same purpose. Amoco asserts that "compliance with . . . s. 100.18(2) would cause Amoco to violate 16 CFR, s. 251.1(d)." Sec. 251.1(d) provides that the supplier is not authorized to engage in the illegal setting or policing of retail prices. We do not accept Amoco's assertion. Sec. 100.18(2), Stats., does not require Amoco to engage in the illegal practice of policing or setting retail prices. Sec. 100.18(2) requires Amoco, if it is going to advertise combination sales, to set forth the retail price of the tires which has been lawfully established by the retailer.

Amoco's claim of preemption does not rise to a clear demonstration of "square conflict." We do not read sec. 100.18(2) as prohibiting acts which the federal government requires, or as requiring conduct which the federal government has prohibited. We read sec. 100.18(2) as prohibiting Amoco from engaging in a practice which the Guides cited do not expressly prohibit. The state may very well be holding Amoco to a higher standard than do the Guides. Because the FTC Guides appear to describe in general terms the minimum, rather than the maximum, requirements for advertising, we do not find the state's law in conflict with the federal law.

Nor can Amoco show that preemption exists on the ground that sec. 100.18(2) frustrates the purposes of the FTCA. We have examined the "state's interests in regulating the conduct in question and the potential for interference with the federal regulatory scheme," *Farmer v. United Brotherhood of Carpenters,* 430 U.S. 290, 297

(1977), and we conclude that the Wisconsin law does not necessarily prevent the "accomplishment and execution of the full purposes and objectives of Congress" in enacting the FTCA. *Jones v. Rath Packing Co.*, 430 U.S. 519, 543 (1977). The federal policy clearly favors providing more information to the consumer rather than less. Badal, *Restrictive State Laws & The Federal Trade Commission*, 29 Adm. L. Rev. 239, 259, n. 106 (1977). Sec. 100.18(2), Stats., does not restrict advertising; it is not anti-advertising. The statute is central to and integral to the state's regulatory interests and is not inimical to the federal policies.

On the basis of the record before us we conclude that neither the FTCA nor the FTC Guides exclude all state regulation of combination sales; that the FTC Guides are interpretive rules and do not operate to preempt state law; that sec. 100.18(2), Stats., does not conflict with the FTC Guides; and that sec. 100.18(2) is compatible with the objectives of the FTCA and the FTC Guides.

IV.

Without question Amoco's advertising program and sales constitute interstate commerce, and the state statute imposes a restraint on interstate commerce. Although Amoco concedes that not all restraints are invalid, Amoco contends that sec. 100.18(2), Stats., is unconstitutional because it constitutes an excessive burden on interstate commerce.

The standard to be applied to determine if a state statute violates the Commerce Clause, U. S. Const. Art. I, sec. 8, cl. 3, has been recently summarized in *Philadelphia v. New Jersey*, 437 U.S. 617, 623–624 (1978) as follows:

"The opinions of the Court through the years have reflected an alertness to the evils of 'economic isolation'

and protectionism, while at the same time recognizing that incidental burdens on interstate commerce may be unavoidable when a State legislates to safeguard the health and safety of its people. Thus, where simple economic protectionism is effected by state legislation, a virtually *per se* rule of invalidity has been erected. [Cites omitted.] The clearest example of such legislation is a law that overtly blocks the flow of interstate commerce at a State's borders. [Cites omitted.] But where other legislative objectives are credibly advanced and there is no patent discrimination against interstate trade, the Court has adopted a much more flexible approach, the general contours of which were outlined in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142:

" 'Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. . . . If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.' "

Sec. 100.18(2), Stats., does not discriminate against interstate commerce. The statute regulates evenhandedly; it applies the same standard to interstate and intrastate advertisers.

Therefore in determining whether sec. 100.18(2), Stats., offends against the commerce clauses, this court must weigh the nature and importance of the local benefits against the amount and extent of the burden which the statute imposes on interstate commerce and must consider whether there are "other reasonable means of achieving the same objective with less impact on interstate commerce." *Coffee-Rich, Inc. v. Dept. of Agriculture,* 70 Wis.2d 265, 277, 234 N.W.2d 270 (1975).

As we explained earlier, the statute is designed to effectuate a legitimate state public interest, *i.e.,* to protect

consumers from deception by requiring advertisers to provide critical information at an early stage of the purchasing process. The statute does not prohibit combination sales in Wisconsin or the advertising of combination sales. The statute regulates the advertising of combination sales. We recognize, however, that an advertiser might not be able to meet the requirements of sec. 100.-18(2) when using a particular advertising media, *e.g.*, radio and television, because of space and time limitations and the geographical area covered by the advertisement.

Amoco argues that the effect of sec. 100.18(2), Stats., is to prohibit it from promoting combination sales in Wisconsin or to force it to incur substantial expenses in its national advertising campaigns for special advertisements in Wisconsin. Amoco claims that it would be forced to discontinue using television and radio to announce combination sales if the station is located in Wisconsin and perhaps even if the station is located outside Wisconsin if its listening audience is predominantly Wisconsinites. Amoco maintains that Wisconsin and non-Wisconsin consumers are deprived of commercial information and that these interstate effects of sec. 100.18(2) are unconstitutional.

We conclude that the effect of the state statute on interstate commerce is incidental and not excessive. In *Head v. New Mexico Board of Examiners*, 374 U.S. 424, 429 (1963), the United States Supreme Court held that the State of New Mexico could prevent newspaper publication and radio broadcast within New Mexico of proscribed price advertising by optometrists without violating the commerce clause, even though the advertisements were by a Texas optometrist and the radio and newspaper located in New Mexico serviced part of Texas. The United States Supreme Court did not view the incidental effect of the New Mexico law on residents of other states

as violative of the commerce clause. 374 U.S. at 429 n. 5. Although New Mexico's ban on advertising by optometrists might no longer be allowed on first amendment grounds, *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 756, 769 (1976), and *Bates v. State Bar of Arizona*, 433 U.S. 350, 357 (1977), the holding of *Head* that a state is allowed to regulate newspaper and radio advertising when it pursues a legitimate state purpose, the benefits of which are not outweighed by a burden on interstate commerce, is still good law. As Justice Brennan said, "All that the Court decides today is that this New Mexico statute may constitutionally be enforced against radio broadcasters equally with other news media doing business in New Mexico." *Head v. New Mexico Board of Examiners*, 374 U.S. 424, 448 (1963) (Brennan, J., concurring).

A number of cases have held that a state may regulate direct mail advertising by a foreign corporation without unduly burdening interstate commerce. *See, e.g., Aldens, Inc. v. La Follette*, 552 F.2d 745 (7th Cir. 1977), *cert. denied* 434 U.S. 880 (1977); *Aldens, Inc. v. Packel*, 524 F.2d 38 (3d Cir. 1975), *cert. denied*, 425 U.S. 943 (1976); *People v. Fairfax Family Fund, Inc.*, 235 Cal. App.2d 881, 47 Cal. Rptr. 812 (1964), appeal dismissed, 382 U.S. 1 (1965). The costs Amoco quotes to alter some of its advertisements to comply with Wisconsin requirements appear to be much less than the extra annual costs involved in the *Aldens v. Packel* and *Aldens v. La Follette* cases, $803,000 in Pennsylvania and $163,900 in Wisconsin.

Amoco argues that the burden imposed on interstate commerce by sec. 100.18(2), Stats., is clearly excessive in relation to the benefits gained by Wisconsin consumers. Amoco asserts that federal law, although not requiring price disclosures in combination sale advertising, sufficiently protects Wisconsin consumers from decep-

tion, and Amoco suggests that the state could use less drastic means to accomplish its purpose, such as requiring point-of-sale advertising or prosecuting sellers who engage in deceptive advertising or deceptive practices. As we discussed previously, the alternatives suggested by Amoco are not practicable, because they do not achieve the legislative purpose set forth in sec. 100.18(2), Stats.

If Amoco finds it impossible to list actual prices in certain advertisements of combination sales, it may substitute alternative advertising for Wisconsin consumers, or may insert the words "void in Wisconsin" in its advertising. Note, *State Regulation of Radio and Television*, 73 Harv. L. Rev. 386, 393–95 (1959); Pitofsky, *Beyond Nader: Consumer Protection and the Regulation of Advertising*, 90 Harv. L. Rev. 661, 671–73 (1977).

We conclude that the state's interest in preventing unfair trade practices in the instant case outweighs the incidental burdens on interstate commerce.

Amoco maintains that uniformity in regulation is required and that 50 states regulating national advertisers engaged in interstate business creates chaos and is an undue burden on interstate commerce. Amoco has made no showing of actual conflict among the rules of different states, and we refuse to invalidate a nondiscriminatory state law on Amoco's unsupported assertion of possible conflict among 50 states. *Head v. New Mexico Board of Examiners*, 374 U.S. 424, 429 (1963).

As we have discussed previously, we can find no evidence that Congress intended that there be uniform federal regulation controlling advertisements of combination sales or that all state regulation of combination sales or deceptive advertising is preempted by federal law. Nor can we conclude that regulation of combination sales or price advertising is a subject which, by its very na-

ture, requires the nation to speak with one voice. Deceptive business practices have traditionally been regulated by the state, and state regulation in addition to federal regulation, allows for experimentation by the states, allows for regulation suitable to local conditions, and provides increased protection for the consumer. States should be given broad latitude, within constitutional limits, in their economic experiments, and overbroad application of the doctrines of uniformity or preemption is violative of the fundamental constitutional principle of federalism.

We conclude that sec. 100.18(2), Stats., does not place an excessive burden on interstate commerce and therefore does not violate the commerce clause of the United States Constitution.

## V.

Amoco contends that sec. 100.18(2), Stats., imposes an impermissible restraint on its First Amendment rights.

It is beyond question that the United States Supreme Court has accorded commercial speech the protection of the First Amendment. *See, e.g., Ohralik v. Ohio State Bar Assn.,* 436 U.S. 447 (1978); *Bates v. State Bar of Arizona,* 433 U.S. 350 (1977); *Linmark Associates, Inc. v. Willingboro,* 431 U.S. 85 (1977); *Carey v. Population Services International,* 431 U.S. 678 (1977); *Virginia Pharmacy Board v. Virginia Consumer Council,* 425 U.S. 748 (1976); *Bigelow v. Virginia,* 421 U.S. 809 (1975).[6] The rationale of these cases is that a market economy depends on the "free flow of commercial information" and the "efficient allocation of resources depends upon

---

[6] For a discussion of these cases, *see* Jackson & Jeffries, Jr., *Commercial Speech: Economic Price Process & The First Amendment,* 65 Va. L. Rev. (1979).

informed consumer choices." *Friedman v. Rogers,* 440 U.S. 1, 8, 9 (1979).

It is also beyond question that false, deceptive or misleading advertisement is subject to restraint. *Bigelow v. Virginia, supra,* 421 U.S. at 828; *Virginia Pharmacy Board, supra,* 425 U.S. at 771–772, 772 n. 24, 777; *Linmark Associates, Inc. v. Willingboro, supra,* 431 U.S. at 91–92; *Bates v. State Bar of Arizona, supra,* 433 U.S. at 383. The First Amendment does not prohibit the state "from insuring that the stream of commercial information flow[s] cleanly as well as freely." *Virginia Pharmacy Board, supra,* 425 U.S. at 772. The United States Supreme Court has recognized that a state's interest in protecting the public from deception is substantial. *Friedman v. Rogers,* 440 U.S. 1, 15 (1979).

The United States Supreme Court has framed its decisions narrowly in dealing with restrictions on commercial speech "allowing modes of regulation that might be impermissible in the realm of noncommercial expression." *Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 456 (1978), quoted with approval in *Friedman v. Rogers,* 440 U.S. 1, 11 n. 9 (1979).

The Wisconsin legislature has demonstrated a strong interest over many years in protecting the public from combination sales, a form of advertising which it has recognized as potentially deceptive.[7] The potential for

---

[7] In 1947, Laws of 1947, Ch. 323, sec. 2, the legislature prohibited gifts of merchandize contingent upon the purchase of any other item of merchandize. In 1955, the legislature amended the statutes to permit advertisements of "free" gifts contingent on a purchase if "the fact that such purchase is necessary is clearly stated in the advertisement . . .", but gifts contingent on the sale of petroleum products at retail were prohibited. Laws of 1955, Ch. 460. The legislature amended the law again in 1959, Laws of 1959, Ch. 531, and in 1961, when the existing sec. 100.18 (2) was created. Laws of 1961, Ch. 44.

deception in offering "free" items conditioned on the purchase of other items has also been identified and regulated by the FTC.[8]

Sec. 100.18(2), Stats., does not stifle commercial speech; it does not proscribe informational advertising; it guarantees that certain helpful information will be disseminated. The Wisconsin statute does "no more than require that commercial information . . . 'appear in such a form . . . as [is] necessary to prevent its being deceptive.'" *Friedman v. Rogers*, 440 U.S. 1, 16 (1979).

Amoco points out that the state does not claim that Amoco's advertisements were actually misleading or deceptive. Amoco's briefs urge that only "advertisements which are *actually* false, deceptive or misleading may constitutionally be prohibited . . . . [T]he mere *possibility* that an advertisement may mislead or deceive is constitutionally insufficient to warrant the denial of First Amendment rights."

The United States Supreme Court recently rejected this argument in *Ohralik v. Ohio State Bar Association,* 436 U.S. 447 (1978), and we reject it in the same at bar. The United States Supreme Court found that the state's rules prohibiting attorney solicitation "are prophylactic measures whose objective is the prevention of harm before it occurs;" the state's rules were applied in "circumstances likely to result in the adverse consequences the State seeks to avert." The Court noted that in a situation "which is inherently conducive to overreaching and other forms of misconduct, the State has a strong interest in adopting and enforcing rules of conduct designed to protect the public . . . ." *Id.* at 464. The Court concluded that the State's perception of the potential for harm in circumstances presented in *Ohralik* was well founded and that it was not "unreasonable, or violative of the Constitution, for the State

[8] 2 Rosden & Rosden, *The Law of Advertising* sec. 28.06 (1980).

to respond with what is in effect a prophylactic rule." *Id.* at 467. We similarly conclude in this case.

Amoco also asserts that sec. 100.18(2), Stats., is unconstitutionally overbroad. This assertion is based on Amoco's incorrect assumption that the state cannot constitutionally restrict a potential harm. Moreover, the United States Supreme Court has limited the application of the overbreadth analysis in the ordinary commercial speech context, saying:

> "Advertising that is false, deceptive, or misleading of course is subject to restraint. *See Virginia Pharmacy Board v. Virginia Consumer Council,* 425 U.S., at 771–772, and n. 24, 96. Since the advertiser knows his product and has a commercial interest in its dissemination, we have little worry that regulation to assure truthfulness will discourage protected speech. *Id.,* at 771–772 n. 24. And any concern that strict requirements for truthfulness will undesirably inhibit spontaneity seems inapplicable because commercial speech generally is calculated. Indeed, the public and private benefits from commercial speech derive from confidence in its accuracy and reliability. Thus, the leeway for untruthful ·or misleading expression that has been allowed in other contexts has little force in the commercial arena." *Bates v. State Bar of Arizona, supra,* 433 U.S. at 383.

We conclude that sec. 100.18(2), Stats., does not constitute an impermissible restraint of free speech in violation of the federal or state constitution.

## VI.

Amoco's final objection to sec. 100.18(2), Stats., is that it violates the due process requirements of the United States and Wisconsin Constitutions by imposing an "arbitrary capricious and economically burdensome restraint that do[es] not bear any rational relationship to the public health, safety, morals or welfare." It concedes that the state objective to "effectively smoke out

actual deception" is proper, but it challenges the means chosen to attain the objective.

The due process clause of the Fourteenth Amendment requires us to determine whether the state interest is sufficient to justify the exercise of legislative power over a private transaction. We are balancing the interests of the state and the person.

The legislature, not the court, determines whether the public interest requires the regulation of combination sales. A court should not overturn this kind of legislative determination if any reasonable basis exists to support the legislature's conclusion that the public interest requires such legislation. The court should not substitute its social and economic beliefs for the judgment of the legislative body. The legislature has broad scope to experiment with solutions to economic problems and has the power to regulate injurious commercial and business practices as long as it does not run afoul of the federal constitution, state constitution or federal statutes. *Ferguson v. Skrupa,* 372 U.S. 726, 730–731 (1963).

We have described the purpose and operation of sec. 100.18(2), Stats., previously, and we are satisfied that a reasonable basis exists for the legislature to conclude that combination sale advertising is potentially deceptive and that requiring advertising to disclose the total price is reasonably related to the objective of preventing deception and fraud. Sec. 100.18(2) thus bears a rational relation to the constitutionally permissible objective of regulating business to prevent deception. *Williamson v. Lee Optical Co.,* 348 U.S. 483, 491 (1955) ; *North Dakota Pharmacy Board v. Snyder's Stores,* 414 U.S. 156, 164–166 (1973).

For the foregoing reasons, we hold that sec. 100.18(2), Stats., is constitutional, and we affirm the judgment of the circuit court.

*By the Court.*—Judgment affirmed.