ANTWAUN A., a minor, by his Guardian ad Litem, Emmanuel L. Muwonge, Plaintiffs-Appellants,

STATE of Wisconsin DEPARTMENT OF HEALTH & SOCIAL SERVICES and Racine County Department of Human Services, Plaintiffs,

v.

HERITAGE MUTUAL INSURANCE COMPANY, Defendant-Respondent,

Ernestine HONEYCUTT, Truck Insurance Company, Cigna Insurance Company, Commercial Union Insurance Company, and Horace Mann Insurance Company, Defendants,

Gene MATTHEWS a/k/a The Reverend Gene Matthews, State Farm General Insurance Co., Gerald H. Bassinger and Judith Bassinger, Secura Insurance, a mutual company, and Ziko Milicevic, Defendants-Third-Party Plaintiffs-Respondents,†

Ernie VETO d/b/a Racine Apartment Managers, State Farm Fire & Casualty Co., and Gerald Hoornstra, Defendants-Third-Party Plaintiffs,

v.

Maxine THOMAS, Roman Serembiczky, Carl R. Eisenman, John W. Carbonneau, Joe H. Halbur, Paulette A. Martini, and First Bank Southeast n/k/a Firstar Bank, a domestic corporation, and City of Racine, Third-Party Defendants.

† Motion for reconsideration denied September 30, 1999.

44

Supreme Court

*No. 97–0332. Oral argument December 1, 1998.—Decided July 9, 1999.*

(Also reported in 596 N.W.2d 456.)

47

For the plaintiff-appellant there was a brief by *Emmanuel L. Muwonge* and *Muwonge & Associates, S.C.*, Milwaukee and oral argument by *Emmanuel L. Muwonge*.

For the defendant-respondent, Heritage Mutual, the cause was submitted on the brief of *Arthur P. Simpson* and *Simpson & Deardorff*, Milwaukee.

For the defendant-third-party plaintiff-respondent, Reverend Gene Matthews, there was a brief by *Wayne M. Yankala, Karyn Gimbel Youso* and *Mingo & Yankala, S.C.*, Milwaukee and oral argument by *Wayne M. Yankala.*

For the defendants-third-party plaintiffs-respondents, Gerald & Judith Bassinger and State Farm General Insurance, there was a brief by *Michael A. Mesirow, Thomas A. Cabush* and *Kasdorf, Lewis & Swietlik, S.C.*, Milwaukee and oral argument by *Michael A. Mesirow.*

For the defendants-third-party plaintiffs-respondents, Ziko Milicevic & Secura Insurance Company, there was a brief (in the court of appeals) by *James T. Murray, Jr., Molly C. Feldbruegge* and *Peterson, Johnson & Murray, S.C.*, Milwaukee and oral argument by *James T. Murray, Jr.*

Amicus curiae brief was filed by *Heiner Giese* and *Giese & Weden Law Offices*, Milwaukee for the Apartment Association of Southeastern Wisconsin, Inc.

Amicus curiae brief was filed by *Mark K. Thomsen* and *Cannon & Dunphy, S.C.*, Brookfield for the Wisconsin Academy of Trial Lawyers.

Amicus curiae brief was filed by *Thomas M. Pyper, Elizabeth M. Estes* and *Whyte, Hirschboeck, Dudek, S.C.*, Milwaukee for the Wisconsin Realtors Association, The Institute for Real Estate Management and The Wisconsin Apartment Association.

¶ 1. ANN WALSH BRADLEY, J. This case is before the court on certification from the court of appeals pursuant to Wis. Stat. § 809.61 (1997–98). The court of appeals asks this court to address the following question:

Does a landlord of an older residential rental property have a common law duty to inspect, or test, for contamination from lead-based paint once the landlord knows that the paint is flaking from the walls?

We conclude that the presence and danger of lead paint was foreseeable and determine that the landlords had a common law duty to test the residential property for lead paint. Because the circuit court erred in granting summary judgment and in concluding that no common law duty existed, we reverse and remand that part of the circuit court's decision.

¶ 2. In addition to the certified issue, we accepted for review all issues raised in Antwaun A.'s appeal. He asserts a violation of Wisconsin's Safe Place Statute. Because the affected parts of the properties were not places of employment or public buildings, we conclude that this cause of action must fail. We also determine that, contrary to Antwaun A.'s argument, a violation of neither Wis. Stat. § 151.07(2)(d) (1991–92)[1] nor City of Racine Ordinance § 11.09.040(e) constitutes negligence per se. Finally, we decide that Antwaun A. may not maintain a personal injury cause of action based on any implied warranty of habitability. Accordingly, on these issues we affirm the circuit court's grant of summary judgment against Antwaun A.

¶ 3. We are asked in this case to determine when landlords have a duty to test their rental properties for lead paint. In May of 1991, three-year-old Antwaun A. was diagnosed with lead poisoning. He contends that this poisoning was caused by lead paint peelings, flakes, and chips that he had ingested in various apart-

[1] 1993 Wis. Act 27, § 433 renumbered Wis. Stat. § 151.07(2)(d) as § 254.166. All further references to the Wisconsin Statutes will be to the 1991–92 version unless otherwise noted.

ments in the City of Racine. Two apartments are at issue in this appeal.

¶ 4. First, Gerald and Judith Bassinger (the Bassingers) owned a residence in the City of Racine (the Bassinger Property) where Antwaun A. and his mother, Maxine Thomas, resided from August 1990 to May 1991. This property contained three separate rental units.

¶ 5. Second, Gene Matthews owned a residence in the City of Racine (the Matthews Property) where Antwaun A.'s aunt, Willie May Williams, resided from March 1989 to January 1994. Neither Antwaun A. nor his mother ever resided at the Matthews Property, although Antwaun A. alleges that he frequently was a guest at his aunt's residence. The Matthews Property was a single-family dwelling which Matthews rented to Williams during the time at issue in this appeal. Both the Bassingers and Matthews were insured by State Farm General Insurance Company.

¶ 6. Shortly after being diagnosed with lead poisoning, Antwaun A. filed suit against a host of corporations, individual landlords, and their insurers. In his complaint, Antwaun A. alleged five causes of action as follows:

(1) common law negligence;

(2) violation of Wis. Stat. § 151.07(2)(d), constituting negligence per se;

(3) "failure to warn;"

(4) violation of the City of Racine Ordinance § 11.09.040(e), constituting negligence per se; and

(5) breach of the implied warranty of habitability.

Six months later, Antwaun A. amended his complaint to add a violation of Wisconsin's "Safe Place Statute," Wis. Stat. § 101.11(1), as a sixth cause of action.

¶ 7. All of the defendants save the Bassingers, Matthews, and State Farm either settled with Antwaun or were dismissed from the suit for various reasons unimportant for this appeal.[2] After discovery,

---

[2] Defendant Ziko Milicevic and his insurer, Secura Insurance, were part of the summary judgment motion at the circuit court below. The circuit court concluded that Antwaun A. had failed to produce any evidence that he had been exposed to lead paint on the Milicevic property and failed to oppose Milicevic's motion for summary judgment. Milicevic and Secura were dismissed from the action.

When Antwaun A. filed this appeal, he included Milicevic and Secura as respondents. However, much like in the circuit court, Antwaun A. did not set forth in this court any argument against Milicevic. We conclude that, having failed to oppose Milicevic's summary judgment motion at the circuit court, Antwaun in effect consented to the dismissal. *See Agnew v. Baldwin*, 136 Wis. 263, 267, 116 N.W. 641 (1908). Antwaun A. admitted as much at oral argument. Upon remand, Milicevic and Secura are dismissed from this action.

Additionally, Heritage Mutual Insurance Company, the company that had provided insurance to Matthews from March 1994 to October 1995, argued to this court that it should be dismissed from the case. First, it contends that there was no evidence of lead poisoning during the period of time it provided coverage to Matthews. Second, it argues that its policy with Matthews contained a "pollution exclusion clause" that excludes coverage for lead poisoning.

In light of our recent decision in *Peace v. Northwestern National Ins. Co.*, 228 Wis. 2d 106, 596 N.W.2d 429 (1999), we conclude that Heritage is under no obligation to provide coverage for lead poisoning as that falls within the pollution exclusion clause of its policy with Matthews. The clause here is identical to the one that appeared in *Peace*.

these remaining defendants brought various motions for summary judgment.

¶ 8. The circuit court granted summary judgment as to all the remaining defendants on every one of Antwaun A.'s causes of action.[3] The circuit court reasoned that neither of the apartments violated the Safe Place Statute, the Matthews Property because it was not covered by the statute and the Bassinger Property because the peeling paint was not in a public or common area. As for Antwaun A.'s claims of negligence per se because of the violation of Wis. Stat. § 151.07(2)(d) and the City of Racine Ordinance, the circuit court concluded that the legislative bodies that enacted these rules did not express an intent for their violation to constitute negligence per se.

¶ 9. The circuit court further concluded that, while the Bassingers and Matthews may have had actual or constructive knowledge about peeling or chipping paint, no evidence in the record suggested that either landlord had any actual or constructive knowledge of the presence of lead on their properties.[4] Noting that Wisconsin law was silent, the circuit court looked to various other jurisdictions that had decided the issue. The circuit court concluded that Wisconsin ought to follow those other jurisdictions that have required a landlord to have either actual or constructive knowledge of lead paint before a duty to act attends.

¶ 10. Finally, the circuit court determined that the landlords violated no implied warranty of habitability. It posited that such a duty was applicable only to

---

[3] Circuit Court for Racine County, Wayne Marik, Judge.

[4] The circuit court grouped the common law negligence cause of action with the "failure to warn" cause of action, concluding that they were both "based upon principles of common law negligence."

a tenant under a lease. This precluded Matthews from being negligent since Antwaun A. was not a tenant in his building. Similarly, the circuit court concluded that the implied warranty of habitability did not impose liability on the Bassingers because only damages under the lease contract are actionable. Since Antwaun A. was seeking damages for personal injuries, the circuit court granted summary judgment in favor of the landlords.

¶ 11. Antwaun A.'s case was dismissed in its entirety. He appealed to the court of appeals which certified the case to this court.

¶ 12. It is well settled that when this court reviews a motion for summary judgment it applies the same standards as the circuit court: summary judgment should only be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Grams v. Boss*, 97 Wis. 2d 332, 338–39, 294 N.W.2d 473 (1980); Wis. Stat. § 802.08. This appeal requires that we both interpret statutes and assess the scope of a common law duty. These are questions of law that we review independently of the legal determinations rendered by the circuit court. *Deutsches Land, Inc. v. City of Glendale*, 225 Wis. 2d 70, 591 N.W.2d 583; (1999) (interpretation of statutes question of law); *Ceplina v. South Milwaukee School Board*, 73 Wis. 2d 338, 341, 243 N.W.2d 183 (1976) (existence and scope of duty question of law); *In re Revocable Trust of McCoy*, 142 Wis. 2d 750, 754, 419 N.W.2d 301 (Ct. App. 1987).

I.

¶ 13. We address first whether the circuit court erred in granting summary judgment against Antwaun

54

A. on his cause of action based on the common law duty to exercise ordinary care in testing for lead paint. Antwaun A. argues that the circuit court erred when it concluded that the landlords were under no common law duty to test for lead paint absent actual or constructive knowledge that their particular properties contained lead paint. We agree. As a result, we conclude that a landlord of a house constructed prior to 1978 is under a common law duty to test for lead paint when the landlord knows or, in the use of ordinary care, should have known that the residence contained peeling or chipping paint. We therefore reverse the circuit court's grant of summary judgment in favor of the landlords.

¶ 14. As with any negligence claim, Antwaun A. must show that there exists: (1) A duty of care on the part of the defendant; (2) a breach of that duty; (3) a causal connection between the conduct and the injury; and (4) an actual loss or damage as a result of the injury. *Rockweit v. Senecal*, 197 Wis. 2d 409, 418, 541 N.W.2d 742 (1995). This case involves a determination of only the first prong: whether the landlords had a duty to test for lead paint, and if so, when that duty arose.

¶ 15. In this state all persons have a duty of reasonable care to refrain from those acts that unreasonably threaten the safety of others. *Klassa v. Milwaukee Gas Light Co.*, 273 Wis. 176, 77 N.W.2d 397 (1956) (adopting *Palsgraf v. Long Island R. Co.*, 162 N.E. 99, 103 (N.Y. 1928) (Andrews, J., dissenting)). This duty arises "when it can be said that it was foreseeable that his act or omission to act may cause harm to someone." *A.E. Investment Corp. v. Link Builders, Inc.*, 62 Wis. 2d 479, 483–84, 214 N.W.2d 764 (1974);

*see also Rolph v. EBI Cos.*, 159 Wis. 2d 518, 532, 464 N.W.2d 667 (1991). Thus, the existence of a duty hinges on foreseeability. These general principles of negligence are fully applicable in the landlord and tenant context. *Pagelsdorf v. Safeco Ins. Co. of America*, 91 Wis. 2d 734, 742–43, 284 N.W.2d 55 (1979); Wis JI-Civil 8020 (1996).

¶ 16. All parties in large part agree on the test that should be employed to ascertain whether it was foreseeable that peeling and chipping paint would result in lead poisoning. That test is nothing more than a specific application of the general duty a landlord has to use ordinary care under the circumstances to avoid exposing persons lawfully on the property from an unreasonable risk of harm. *Pagelsdorf*, 91 Wis. 2d at 741–43; Wis JI-Civil 8020 (1996);[5] *see also Restatement (Second) of Torts*, § 358, p. 243 (1965). The applicable test essentially consists of two parts: (1) whether the landlord knew or in the use of ordinary care should have known about the presence of peeling and chipping paint; and (2) whether the landlord knew or in the use of ordinary care should have known that the chipping and peeling paint contained lead.

---

[5] **Wis JI-Civil 8020: Duty of Owner or Possessor of Real Property to Nontrespasser User.** An owner of property must use ordinary care under the existing circumstances to maintain his or her premises to avoid exposing persons on the property with consent to an unreasonable risk of harm. . . .

In performing this duty, an owner of premises must use ordinary care to discover conditions or defects on the property which expose a person to an unreasonable risk of harm. If an unreasonable risk of harm existed and the owner was aware of it, or, if in the use of ordinary care he or she should have been aware of it, then it was his or her duty to either correct the condition or danger or warn other persons of the condition or risk as was reasonable under the circumstances.

¶ 17. This case does not primarily concern the first part of the test.[6] Both landlords had notice of deteriorating paint in the apartments that they rented to Antwaun A.'s mother and aunt. It is also undisputed that the landlords did not have any actual knowledge of lead paint on their properties during the time that Antwaun A. or his relatives were tenants at the two properties.

¶ 18. The contested issue in this case concerns whether the Bassingers or Matthews should have known of the presence of lead paint. The landlords maintain that they should not have known, as the record is devoid of any facts that would permit the inference that they were presented with any information that would tip them off to the possibility of lead paint on their properties. Antwaun A. maintains that the landlords should have known of the possibility of lead paint because common knowledge would suggest that it would be foreseeable that older houses in an urban area contain lead paint.

¶ 19. All parties agree that there is no Wisconsin law that directly addresses this issue. The landlords

---

[6] Matthews readily admits that he received notice of peeling paint in 1990 when the Matthews Property was inspected by the Racine County Housing Authority. The Bassingers, however, contend that they were never notified of peeling paint in the bathroom where the lead paint was eventually discovered. Rather, they state that they were notified of cracked and crumbling plaster on the ceiling of the bathroom and rectified that problem.

We see no merit in the Bassingers' attempt to draw a distinction between paint chips and plaster chips because, as they admitted at oral argument, the plaster in the bathroom was painted. The dust and debris associated with paint-laden crumbling plaster is indistinguishable from the dust and debris associated with only the peeling paint.

point us to a number of cases from across the country in support of their position. *See* Sonja Larson, *Landlord's Liability for Injury or Death of Tenant's Child From Lead Paint Poisoning*, 19 A.L.R.5th 405, 419–24. § 3(b) (1994). These cases hold that a landlord's duty to test for lead paint is not triggered by the peeling of paint in a house constructed prior to 1978, the year that the use of lead paint was banned.[7] Courts have concluded that such injuries are not foreseeable because knowledge of the dangers of lead paint are not within the common knowledge of landlords. *Kolojeski v. John Deisher, Inc.*, 239 A.2d 329, 331 (Pa. 1968); *Hayes v. Hambruch*, 841 F. Supp. 706, 711 n.2 (D. Md. 1994); *see also Garcia v. Jiminez*, 539 N.E.2d 1356, 1359 (Ill. App. 2 Dist. 1989); *c.f. Richwind Joint Venture 4 v. Brunson*, 645 A.2d 1147, 1155 (Md. 1994). Similarly, courts have concluded that such injuries are not foreseeable because a landlord would not expect a tenant to "eat[ ] a portion of the premises." *Montgomery v. Cantelli*, 174 So. 2d 238, 240 (La. 1965); *see also Dunson v. Friedlander Realty*, 369 So. 2d 792, 795 (Ala. 1979); *but see Norwood v. Lazarus*, 634 S.W.2d 584, 587 (Mo. App. 1982); *Acosta v. Irdank Realty Corp.*, 238 N.Y.S.2d 713, 714 (N.Y. Sup. Ct. 1963).

¶ 20. While we recognize that the above cases and others like them represent the majority position, we are not persuaded that their rationales continue with as much force as they may have at one time. Many of the courts that adopted the rule of law proposed by the landlords in this case were based on facts that arose from the 1960s and 1970s when knowledge of the

---

[7] Pursuant to its authority under the Consumer Product Safety Act, 15 U.S.C. § 2057, 2058, the Consumer Products Safety Commission banned lead paint for residential uses after February 27, 1978. 16 C.F.R. § 1303.1 (1999).

dangers of lead paint was not widespread. *Hayes*, 841 F. Supp. at 708 (lead poisoning diagnosed in 1978); *Dunson*, 369 So. 2d at 795 (case decided in 1979); *Kolojeski*, 239 A.2d at 330 (lead poisoning diagnosed in 1966); *Montgomery*, 174 So. 2d at 239–40 (lead poisoning occurred in the early 1960s); *but see Brown v. Dermer*, 707 A.2d 407, 408 (Md. App. 1998) (lead poisoning diagnosed in 1985).

¶ 21. Some of the more recent applications of this rule are based on binding precedent stretching back three decades. *See, e.g., Felton, by Felton v. Spratley*, 640 A.2d 1358, 1361–62 (Pa. Super. 1994) (relying on the 1968 *Kolojeski* decision). Additionally, some of these courts stated that their decision was based in part on the fact that the dangers of lead paint were not well known and left open the possibility that changed facts would result in changed law. *Hayes*, 841 F. Supp. at 711 n.2; *Kolojeski*, 239 A.2d at 331; *Felton*, 640 A.2d at 1365–67 (Beck, J., dissenting).

¶ 22. We believe that this case presents changed facts and warrants a changed application of law. Here any negligence on the part of the landlords would have occurred no earlier than 1989 when Williams moved into the Matthews Property and 1990 when Antwaun A. moved into the Bassinger Property. Simply put, we are persuaded that awareness of the dangers of lead paint in 1989 or 1990 is on a different plane than the awareness of such dangers ten, twenty, or thirty years earlier. This has a direct bearing on whether it was foreseeable in 1989 or 1990 that peeling or chipping paint in a pre–1978 house contained lead and whether it was foreseeable that lead ingested by children would be an unreasonable risk of physical harm.[8]

[8] We agree with those other courts which have concluded "[i]t is well known that children of tender years have a proclivity

¶ 23. By the 1990s federal, state, and local legislation identifying the dangers associated with lead paint not only existed, but was well-established. Congress passed the Lead-Based Paint Poisoning Prevention Act in 1970, marking the federal government's first comprehensive attempt at abating lead paint in this country. Pub. L. No. 91–695, 84 Stat. 2078 (1971) (codified at 42 U.S.C. § 4821 *et seq.*) As the legislative history to that law indicates, Congress discerned a lack of public awareness of the problems associated with lead paint. Senate Rep. No. 1432, 91st Cong., 2nd Sess. 116 (1970), *reprinted in* 1970 U.S.C.C.A.N. 6130, 6131 ("A paradoxical feature of this insidious disease is the lack of attention it receives.").

¶ 24. In addition to Congress, federal agencies have promulgated rules related to the use and disclosure of lead paint. As noted above, the Consumer Products Safety Commission banned lead paint from residential use after February of 1978. 16 C.F.R. § 1303.1 (1999). Both the Environmental Protection Agency (EPA) and Department of Housing and Urban Development (HUD) have also set 1978 as the threshold date for "target housing"—housing that is likely to contain lead-based paint. 40 C.F.R. § 745.103 (1999); 24 C.F.R. § 35.86. The EPA requires all sellers of residential housing built prior to 1978 to attach the following statement to the contract to sell:

> Every purchaser of any interest in residential real property on which a residential dwelling was built *prior to 1978* is notified that such property may

to put anything they can get into their hands into their mouths." *Norwood v. Lazarus*, 634 S.W.2d 584, 587 (Mo. App. 1982); *see also Acosta v. Irdank Realty Corp.*, 238 N.Y.S.2d 713, 714 (N.Y. Sup. Ct. 1963).

present exposure to lead from lead-based paint that
may place young children at risk of developing lead
poisoning.

40 C.F.R. § 745.113 (emphasis added). *See also* 24
C.F.R. § 35.92(b)(1) (comparable HUD regulation).

¶ 25. Similarly, Wisconsin prohibited the appli-
cation of lead paint in 1980. § 657u, ch. 221, Laws of
1979 (codified at Wis. Stat. § 151.03). At the same time,
the legislature adopted legislation aimed at both iden-
tifying those persons suffering from lead poisoning and
eradicating the presence of lead paint in houses, espe-
cially those occupied by children under the age of six.
§ 657u, ch. 221, Laws of 1979 (codified at Wis. Stat.
§ 151.07).

¶ 26. In addition, the City of Racine enacted an
ordinance in 1975 that prohibited lead paint from
being used on most surfaces. Since 1975, that ordi-
nance has been amended numerous times, culminating
in the current version which resembles Wis. Stat.
§ 151.07. Racine Ord. 11.09.040(e). Through its numer-
ous amendments, however, the City of Racine has not
wavered in its prohibition of lead paint.

¶ 27. While the extent and duration of legislation
in this area suggests that the danger of children
ingesting lead paint chips is foreseeable, the existence
of legislation is not the only reason we reach this con-
clusion. The dangers of lead and lead poisoning have
been frequent topics of public service campaigns. Con-
tained within this record is a copy of a booklet printed
in 1987 reiterating the dangers of lead paint, especially
as it relates to children.

¶ 28. Additionally, the mass media has fre-
quently written articles or produced video segments
highlighting the dangers associated with lead paint,
especially related to children. These reports have also

repeatedly documented that the bulk of the lead poisoning cases stem from older housing where lead paint was applied years ago and has since deteriorated. *See, e.g.*, Jean Latz Griffin, "Lead Paint Poisoning Hits a New Generation," *Chicago Tribune*, Oct. 15, 1989, *available at* 1989 WL 4632504; Dennis J. McGrath, "Lead-Paint Ordinance Denounced by Landlords," *Minneapolis Star-Tribune*, August 8, 1989, *available at* 1989 WL 3808978; Renee Loth, "When Will We Stop Poisoning Our Children?," *Boston Globe*, Feb. 21, 1988, *available at* 1988 WL 4597658; "HUD Rule on Removing Lead-Based Paint Slated," *Wall St. J.*, Feb. 28, 1986, *available at* 1986 WL-WSJ 285949.[9]

¶ 29. In light of all of these considerations, we decline to adopt the duty advanced by the landlords. We are persuaded that by 1989, the dangers of lead paint in residential housing was so extensively known that we would not be ascribing to the landlords "a knowledge and expertise not ascribable. . .to people without special training or experience." *Kolojeski*, 239 A.2d at 331.

¶ 30. Instead we conclude that a duty to test for lead paint arises whenever the landlord of a residential property constructed before 1978 either knows or in the use of ordinary care should know that there is peeling or chipping paint on the rental property. Where peeling or chipping paint is present in a pre–1978 residential structure, it is foreseeable that lead paint may be present which, if accurate, would expose the inhabitants to an unreasonable risk of harm. Based on this conclu-

---

[9] In fact, a cursory search on Westlaw for newspaper or magazine articles related to the dangers of lead paint prior to 1990 returned well over 1,000 articles.

sion, the circuit court erred in granting summary judgment in favor of the Bassingers and Matthews.

## II.

¶ 31. Next we address Antwaun A.'s Safe Place Statute cause of action. The Safe Place Statute, Wis. Stat. § 101.11(1), creates three different categories of persons covered by the statute: employers, owners of places of employment, and owners of public buildings. *Naaj v. Aetna Ins. Co.*, 218 Wis. 2d 121, 126, 579 N.W.2d 815 (Ct. App. 1998). Antwaun A. asserts claims only under the latter two categories.

## A.

¶ 32. We are able to quickly dispose of Antwaun A.'s claim that the apartments were a "place of employment" under the statute. A "place of employment" is defined as

> every place, whether indoors or out or underground and the premises appurtenant thereto where either temporarily or permanently any industry, trade or business is carried on, or where any process or operation, directly or indirectly related to any industry, trade or business, is carried on, and where any person is, directly or indirectly, employed by another for direct or indirect gain or profit, but does not include any place where persons are employed in private domestic service which does not involve the use of mechanical power or in farming. . . .Wis. Stat. § 101.01(2)(f).

¶ 33. It is uncontroverted in the record that neither the Bassingers nor Matthews employed any person on a regular basis at their properties. *See Brueggeman v. Continental Casualty Co.*, 141 Wis. 2d

406, 410–11, 415 N.W.2d 531 (Ct. App. 1987). The "employment" Antwaun A. refers to is, in part, the landlords' occasional entry onto the property to collect rent. Such conduct on the part of a landlord does not make the property a place of employment as to all tenants at all times. *See Frion v. Coren*, 13 Wis. 2d 300, 304, 108 N.W.2d 563 (1961).

■

¶ 34. Similarly, Antwaun A. contends that because Matthews briefly hired a tenant living at one of the properties to make repairs at the property, that act makes the property a place of employment with respect to all tenants and frequenters. This, too, is incorrect under the rule established in *Frion*, 13 Wis. 2d at 304. The properties at issue in this appeal are not places of employment as that phrase is defined in the Safe Place Statute.

### B.

¶ 35. Antwaun A.'s argument that the properties were "public buildings" as that phrase is defined in the Safe Place Statute is also unavailing:

> "Public building" means any structure, including exterior parts of such building, such as a porch, exterior platform or steps providing means of ingress or egress, used in whole or in part as a place of resort, assemblage, lodging, trade, traffic, occupancy, or use by the public or by 3 or more tenants. . . .Wis. Stat. § 101.01(2)(g).

¶ 36. Antwaun A. contends that "tenant" above refers to persons in possession while the landlords contend that the term refers to the number of units in the building. We have never squarely addressed this issue,

but language from our prior cases shows that the landlords have the better argument.

¶ 37. In *Gobar v. Val Blatz Brewing Co.*, 179 Wis. 256, 259, 191 N.W. 509 (1923), this court concluded that a two-story building with two units was not a "public building" under the statute. The upper unit was a residential unit rented to a family of four and the lower unit was a commercial unit rented to an individual who ran a saloon. *Id.* at 256–57. *See also Holcomb v. Szymczyk*, 186 Wis. 99, 100–01, 202 N.W. 188 (1925) ("two-story frame residence building, arranged for and occupied by four families" is considered a public building); *Davis v. Lindau*, 270 Wis. 218, 219–20, 70 N.W.2d 686 (1955) (two-apartment building is not a public building).

¶ 38. Such an interpretation of "tenant" excludes the Matthews Property from the statute, as it was a property with only one unit. The Bassinger Property, however, contained three units and conceivably could be covered under the statute.

¶ 39. The duty of the owner under the Safe Place Statute extends only to those portions used or held out to be used by the public or by the tenants in common. *Lealiou v. Quatsoe*, 15 Wis. 2d 128, 135, 112 N.W.2d 193 (1961); *Frion*, 13 Wis. 2d at 304; *Hemmingway v. City of Janesville*, 275 Wis. 304, 307, 81 N.W.2d 492 (1957). Here, as the circuit court concluded, the record indicates through excerpts of Thomas' deposition that the peeling and chipping paint was present solely in Thomas' bathroom. This was not an area open to the public or shared by the three tenants in common. It does not constitute a violation of the Safe Place Stat-

ute.[10] The circuit court correctly granted summary judgment in favor of both landlords on this issue.

## III.

¶ 40. We next address whether the circuit court erred in granting summary judgment against Antwaun A. on his cause of action based on a violation of Wis. Stat. § 151.07(2)(d) or City of Racine Ordinance § 11.09.040(e). Antwaun A. maintains that a violation of these enactments constitutes negligence per se. We disagree.

¶ 41. The violation of a statute does not automatically impose civil liability. This court has said that three questions must be answered in the affirmative before the violation of a statute will constitute negligence per se:

---

[10] Antwaun A. contends, however, that the bathroom was not the only place in the Bassinger Property that had peeling and chipping paint. He points to an affidavit of an expert witness indicating that the front porch of the Bassinger Property—certainly a common area of the building—experienced chipping and peeling paint as well. The difficulty with the expert, however, is that he did not view the property until well over two years had elapsed since Thomas vacated the apartment.

While his affidavit indicates that the paint deterioration at the *Matthews* Property "had existed there for some time" his statements about the *Bassinger* Property were more circumspect. The expert only indicated that the paint on the porch "had been deteriorating prior to my visit." Considering the length of time between Thomas' tenancy and the expert's visit, the circuit court appropriately concluded that this testimony is insufficient to demonstrate a genuine issue of material fact that would warrant the issue being submitted to the jury.

(1) the harm inflicted was the type the statute was designed to prevent; (2) the person injured was within the class of persons sought to be protected; and (3) there is some expression of legislative intent that the statute become a basis for the imposition of civil liability.

*Tatur v. Solsrud*, 174 Wis. 2d 735, 743, 498 N.W.2d 232 (1993).

¶ 42. This court has repeatedly indicated that a statute will not be interpreted to impose a greater duty than that imposed by the common law unless it "clearly and beyond any reasonable doubt expresses such purpose by language that is clear, unambiguous, and peremptory." *Delaney v. Supreme Investment Co.*, 251 Wis. 374, 380, 29 N.W.2d 754 (1947) (citations omitted); *see also Bennett v. Larson Co.*, 118 Wis. 2d 681, 694, 348 N.W.2d 540 (1984); *Burke v. Milwaukee & Suburban Transport Corp.*, 39 Wis. 2d 682, 689–90, 159 N.W.2d 700 (1968); *Kalkopf v. Donald Sales & Mfg. Co.*, 33 Wis. 2d 247, 254–56, 147 N.W.2d 277 (1967). A court may also look to the legislative history of a statute to discern whether the legislature intended a violation to impose negligence per se. *See Tatur*, 174 Wis. 2d at 743–44; *Bennett*, 118 Wis. 2d at 694.

A.

¶ 43. Wisconsin Stat. § 151.07(2)(d) provides:

(2) If the department determines that lead-bearing paints are present in or upon any dwelling, the department may:. . .

(d) Notify the owner of the dwelling of the presence of lead-bearing paints. The department may issue instructions to remove, replace or cover securely and permanently these paints within 30 days, in a manner the department prescribes. *The*

67

*failure to remove lead-bearing paints within the time prescribed shall be prima facie evidence of negligence in any action brought to recover damages for injuries incurred after the time period expires.*

The statute is designed to discover and correct the sources of lead poisoning. When the Department of Health and Social Services is notified that "an occupant of a dwelling has blood lead poisoning" the department is authorized to inspect the occupant's dwelling "for the presence of lead-bearing paints."[11] Wis. Stat. § 151.07(1). Upon completion of that inspection, the department may take a number of protective measures, including notifying the owner of the dwelling of the lead-based paint and issuing instructions to that owner for the removal of that hazard. Wis. Stat. § 151.07(2).

¶ 44. Antwaun A.'s claim that a violation of this statute constitutes negligence per se is irretrievably snagged for two reasons. Both relate to the issue of whether "there is some expression of legislative intent that the statute become a basis for the imposition of civil liability." *Tatur*, 174 Wis. 2d at 744.

¶ 45. As the circuit court noted, nothing in the record indicates that either the Bassingers or Matthews received any notification from the department that their properties contained lead paint. They did not "fail to remove lead-bearing paints within the time prescribed" by the department in violation of the statute. Wis. Stat. § 151.07(2)(d). Antwaun A. finds this fact irrelevant and argues that it does not relieve landlords of their "independent duty. . .imposed by the statutes" to insure that lead paint is not found on the rental

---

[11] The Department of Health and Social Services is now the Department of Health and Family Services.

property. He contends that under the circuit court ruling, a landlord's duty will in effect vary with the resources available for government officials to conduct inspections.

¶ 46. Antwaun A.'s argument misses the mark. We have discovered no "independent duty" on a landlord that is "imposed" by Wis. Stat. ch. 151. Section 151.07(2)(d) creates a duty on the landlord only upon receiving notice of the presence of lead paint from the department. It does nothing more. This, of course, does not mean that a landlord is necessarily off the proverbial hook; it only means that this statute does not impose any heightened duty on a landlord over and above that imposed by the common law.

¶ 47. In light of these considerations, we cannot conclude that the legislature expressed a clear intention beyond a reasonable doubt that a violation of Wis. Stat. § 151.07(2)(d) constituted negligence per se.[12] *See Burke*, 39 Wis. 2d at 694. The legislature may, of course, enact legislation that evinces its intent to impose negligence per se for a violation of the law; it has not done so in chapter 151.

### B.

¶ 48. City of Racine Ordinance 11.09.040(e) dictates that no dwelling may contain lead paint. However, the ordinance makes some exceptions. Where the paint, having already been legally applied, "tightly adheres" it need not automatically be removed from walls, baseboards, step risers, and other areas that do not present a "chewable surface." Nonetheless,

---

[12] As a result, we need not address the other two factors that must be met for a statute to impose negligence per se.

the ordinance requires "complete paint removal" of certain areas such as windows, handrails, and any chewable surface that might exist in a house regardless of the condition of the paint. Finally, the ordinance requires that areas of peeling, flaking, or chipping paint must be either stripped bare or covered by some durable material such as plasterboard or wood paneling; such surfaces may not merely be repainted.

¶ 49. As the circuit court indicated, this ordinance traces its history to 1970, although it has been amended and recreated several times since then. The substance of these amendments is not important to the resolution of this case.

¶ 50. The circuit court noted, correctly, that the City of Racine's lead paint provision was one of more than a dozen standards that the City considered to be necessary for habitable living quarters. In addition to the lead paint provision, subsection (e), other standards included those ranging from the relatively minor (adequate kitchen cabinet space, subsection (g)) to the substantial (structural integrity of the building, subsection (d)).

¶ 51. There is scant legislative history surrounding the enactment and amendment of this ordinance. The words of the ordinance do not declare any intent to establish a private right of action in favor of those persons affected by a violation of the ordinance. *See McNeill v. Jacobson*, 55 Wis. 2d 254, 258–59, 198 N.W.2d 611 (1972). Indeed, the common council would seem to have disavowed such a result, as it created a penalty provision that imposes fines reaching as high as $750 without mentioning the additional imposition of civil liability in a private suit. Racine Ord. 11.09.070; *see generally, Grube v. Daun*, 210 Wis. 2d 681, 689–91, 563 N.W.2d 523 (1997).

¶ 52. Additionally, given the placement of the lead paint subsection with the panoply of other regulations ranging from the pedestrian (size of screening mesh, subsection (o)) to the weighty (necessity of having a bathroom, subsection (j)), we cannot conclude that the Racine Common Council intended a violation of these provisions to carry with it civil liability. Rather, it would seem as though the common council intended to "secure the safety or welfare of the public as an entity." *McNeill*, 55 Wis. 2d at 259; *see also Kranzush v. Badger State Mut. Cas. Co.*, 103 Wis. 2d 56, 75, 307 N.W.2d 256 (1981).

¶ 53. As noted above, Antwaun A. faces a stiff burden to establish that the common council intended a violation of the ordinance to constitute negligence per se. *Burke*, 39 Wis. 2d at 694; *Delaney*, 251 Wis. at 380. We do not believe that he has met his burden and affirm the circuit court's decision that the violation of this ordinance did not constitute negligence per se.

## IV.

¶ 54. Finally, we address Antwaun A.'s claim that the circuit court erred in granting summary judgment in favor of the landlords on his warranty of habitability cause of action. Antwaun A.'s argument is two-fold. First, he contends that no privity of contract is needed in order to assert a breach of the implied warranty of habitability. Second, he posits that damages under the implied warranty of habitability are not limited to contractual damages but also encompass compensatory damages. We disagree on both counts.

¶ 55. This court first recognized the existence of an implied warranty of habitability in *Pines v. Perssion*, 14 Wis. 2d 590, 111 N.W.2d 409 (1961). Under

that doctrine, the residential lease between a landlord and tenant carries with it an implied promise that the premises will be fit for human habitation. *Id.* at 596–97.

¶ 56. Our cases in this area of law have involved claims of a breach of the lease and have sought contractual damages. *Id.* at 597. We can find no Wisconsin case that has allowed a party to seek compensatory damages for the violation of the implied warranty of habitability. Antwaun A. asserts that this is merely coincidental and not by design. To the contrary, we agree with the circuit court when it artfully stated:

> A tenant's claim for breach of the implied warranty of habitability is a breach of contract claim for contractual damages. An injured parties' claim for personal injuries is a tort claim in negligence for compensatory damages. Such claims may coexist, they may be caused by the same act, and they may be owned by the same party if it is the tenant who was injured. It is not the breach of warranty, however, that gives rise to the cause of action for the personal injury. Instead, it is the negligent act or omission.

*See also Stone v. Gordon*, 621 N.Y.S.2d 220 (N.Y. App. Div. 1995); *Mease v. Fox*, 200 N.W.2d 791, 796–97 (Iowa 1972).

¶ 57. This distinction between negligence and breach of contract is consistent with our statements in *Pagelsdorf*, 91 Wis. 2d at 744–45, where we concluded that it would be "anomalous" for the law to require a landlord to warrant habitability but grant immunity for "the landlord's negligence in maintaining the premises. . .under general negligence principles." The distinction described by the circuit court also comports with the codification of the implied warranty of habita-

bility which addresses damages in contractual terms. Wis. Stat. § 704.07(4).

¶ 58. We conclude that Antwaun A.'s implied warranty of habitability cause of action cannot be maintained against Matthews because Antwaun A. was not in privity of contract with that landlord. Antwaun A.'s implied warranty of habitability cause of action cannot be maintained against the Bassingers because he seeks compensatory rather than contractual damages. The circuit court properly granted summary judgment in favor of the landlords.

## V.

¶ 59. In sum, we conclude that the presence and danger of lead paint was foreseeable and hold that the landlords had a common law duty to test the residential property for lead paint. Because the circuit court erred in concluding that no common law duty existed and in granting summary judgment, we reverse and remand that part of the circuit court's decision. However, we determine that the circuit court properly entered summary judgment in favor of the landlords on all of the other causes of action raised by Antwaun A. Accordingly, we affirm those parts of the circuit court's decision.

*By the Court.*—The judgment of the circuit court is affirmed in part and reversed in part and the cause is remanded.

¶ 60. N. PATRICK CROOKS, J. (*concurring*). Although I concur with the mandate, I write separately to address the majority's conclusion that a landlord's duty to test for lead-based paint arises "whenever the

landlord of a residential property constructed before 1978 either knows or in the use of ordinary care should know that there is peeling or chipping paint on the rental property." Majority op. at 62. I agree that a landlord's duty arises when the landlord knows or, in the use of ordinary care, should know that paint that is flaking, peeling or chipping from the walls contains lead. I concur because I disagree with the majority's quite arbitrary distinction between residential property constructed before and after 1978. Rather, I conclude that a trier of fact should examine all of the circumstances presented in a given case to determine if a landlord had a duty to test for contamination from lead-based paint. Certainly, the age of the premises is but one factor to consider.

¶ 61. The majority begins the analysis by stating that the issue in this case is whether the landlord involved should have known of the presence of lead-based paint. *See* majority op. at 56. This issue pertains to the second element of the majority's test for ascertaining the foreseeability that flaking, peeling or chipping paint would result in lead poisoning.[1] *See* majority op. at 56. The majority bases its foreseeability test, in part, on both Wis JI—Civil 8020 and the Restatement (Second) of Torts § 358 (1965).[2] I first

---

[1] The test, as stated by the majority: "(1) whether the landlord knew or in the use of ordinary care should have known about the presence of peeling and chipping paint; and (2) whether the landlord knew or in the use of ordinary care should have known that the chipping and peeling paint contained lead." Majority op. at 56.

[2] Restatement (Second) of Torts § 358 (1965), "Undisclosed Dangerous Conditions Known to Lessor," states:

(1) A lessor of land who conceals or fails to disclose to his lessee any condition, whether natural or artificial, which involves unrea-

74

note that the language in the majority's foreseeability test is not consistent with the language in § 358. Subsections 358(1)(a) and (b) employ the expression, "has reason to know of the condition. . . ." While the phrase "has reason to know" may seem congruent with the majority's phrase, "should have known," the Restatement (Second) specifically differentiates the two phrases. *See* Restatement (Second) of Torts § 12. Comment (a) to § 12 explains that "[t]hese two phrases. . .differ in that 'reason to know' implies no duty of knowledge on the part of the actor whereas 'should know' implies that the actor owes another the duty of ascertaining the fact in question." Restatement (Second) of Torts § 12 cmt. a (1965). I agree with the majority, however, that we should express the test using the phrase, "should have known," because it is more consistent with the language in Wis JI—Civil 8020[3] and with the case law in Wisconsin.[4]

sonable risk of physical harm to persons on the land, is subject to liability to the lessee and others upon the land with the consent of the lessee or his sublessee for physical harm caused by the condition after the lessee has taken possession, if

(a) the lessee does not know or have reason to know of the condition or the risk involved, and

(b) the lessor knows or has reason to know of the condition, and realizes or should realize the risk involved, and has reason to expect that the lessee will not discover the condition or realize the risk.

(2) If the lessee actively conceals the condition, the liability stated in Subsection (1) continues until the lessee discovers it and has reasonable opportunity to take effective precautions against it. Otherwise the liability continues only until the vendee has had reasonable opportunity to discover the condition and to take such precautions.

[3] The language of Wis JI—Civil 8020 mimics the majority's "know" and "should have known" language: "[i]f an unreasonable risk of harm existed and the owner was aware of it, or, if in

¶ 62. As stated above, the majority premises a landlord's duty to test for lead-based paint on whether a residential rental property was constructed before 1978. *See* majority op. at 60. I disagree with the majority's conclusion that a property's age alone creates circumstances from which a landlord "should have known" that lead exists in chipping or peeling paint. I disagree for several reasons.

¶ 63. First, the 1978 date is arbitrary. The majority points out that lead-based paint was banned for residential uses in 1978 by the United States Consumer Products Safety Commission. *See* majority op. at 58 n.7. While the use of lead-based paint became illegal after 1978, undoubtedly some homes continued to be painted with such paint after that date. In some situations, the majority's test may result in a person that rents a residence built after 1978 not having the same protection as one renting a residence built before 1978, even though the rental residence involved does contain lead-based paint.[5] A landlord should not have a differ-

the use of ordinary care he or she should have been aware of it, then it was his or her duty to either correct the condition or danger or warn other persons of the condition or risk as was reasonable under the circumstances." We recognize that while the phrase, "should have been aware of it," is not exactly the same as the phrase, "should have known," the two phrases are analogous.

[4] *See Maci v. State Farm Fire & Cas. Co.*, 105 Wis. 2d 710, 717, 314 N.W.2d 914 (Ct. App. 1981)(quoting Wis JI—Civil 8020). *See also Rockweit v. Senecal*, 197 Wis. 2d 409, 423 n.6, 541 N.W.2d 742 (1995)(citing Wis JI—Civil 8020 with approval).

[5] For instance, if a tenant lives at a property built after 1978 where the landlord did not know of lead-based paint in the residence, the tenant may have no recourse since the landlord's constructive notice is not triggered by the age of the residence.

ent duty to test solely based on the age of the residence he or she owns.

¶ 64. Second, the ban on the use of lead-based paint in 1978, and the media coverage surrounding it, is not enough to provide a particular landlord with constructive notice of the possibility of lead-based paint in a rental residence. The majority cites to both federal and state legislation prohibiting the use of lead-based paint, as well as media reports documenting the dangers of lead-based paint. *See* majority op. at 58–61. The majority implies that because the danger of lead-based paint is now more well-known, landlords who own residences built before 1978 should know that their residences may contain lead-based paint. *See* majority op. at 60.

¶ 65. The majority opinion states that Wisconsin prohibited the use of lead-based paint in 1980, and that the City of Racine adopted an ordinance in 1975 that banned the use of lead-based paint on most surfaces. *See* majority op. at 61. If we are to adopt a "magic" date, why should it be 1978, rather than 1975 or 1980?

¶ 66. However, the majority never cites evidence of any communication from which a landlord should know that the "magic" year upon which the duty to test is based is 1978. Indeed, the mere fact that lead-based paint's dangers have been publicized does not amount to constructive notice,[6] as required by the majority's

Moreover, tenants may actually be put in danger by the test as stated by the majority because landlords who own residences built after 1978 may be lulled into a false sense of security.

[6] In *Franklin Mutual Insurance Co. v. Meeme Town Mutual*, 68 Wis. 2d 179, 184, 228 N.W.2d 165 (1975)(quoting *Thompson v. Dairyland Mutual Insurance Co.*, 30 Wis. 2d 187, 192, 140 N.W.2d 200 (1966)), this court defined constructive notice as "neither notice nor knowledge but. . .a policy determination that

test. *See Felton by Felton v. Spratley*, 640 A.2d 1358, 1363 (Pa. Super. Ct. 1994). Constructive notice should not be attributed to a landlord simply because his or her property was built before 1978. The majority's distinction, arbitrarily based on the 1978 ban, creates a duty on landlords. The majority has not adequately demonstrated, however, that landlords have had sufficient notice communicated to them that the federal ban on the use of paint containing lead occurred in 1978. If the majority's test remains intact, such a showing may be needed in each and every case.[7] *Id.*

¶ 67. Third, the majority has not cited any legal support for its arbitrary selection of 1978. In discussing constructive notice, the Maryland court of appeals held that "[k]nowledge of a condition which involves unreasonable risk of physical harm to persons on the land may not be imputed to a landlord merely from general knowledge that other properties of like age, construction, or design might possibly contain such hazardous conditions." *Richwind v. Brunson*, 645 A.2d 1147, 1154–55 (Md. Ct. App. 1994). Instead, other jurisdictions have held that constructive notice may be

under certain circumstances a person should be treated as if he had actual notice." The majority's use of the phrase, "should have known," appears to be an adoption of a constructive notice approach.

[7] The majority cites EPA and HUD regulations which require the attachment of statements regarding lead-based paint to contracts for the sale of pre–1978 residential housing. However, such statements would not provide notice to those landlords which have not bought or sold pre–1978 housing since these EPA and HUD regulations became effective. Accordingly, the fact that such statements might be required does not obviate the need to evaluate the extent of the landlord's notice under the facts and circumstances of each particular case.

78

inferred from a landlord's reasonable inspection of a residence. *See, e.g., Norwood v. Lazarus*, 634 S.W.2d 584, 588 (Mo. Ct. App. 1982) (noting that a jury found a landlord knew or should have known that a residence contained lead-based paint because the landlord's manager inspected the property weekly and bought paint for the residence); *Felton*, 640 A.2d at 1361. Another court held that a landlord must retain sufficient control of a residential rental premises to have constructive notice of lead-based paint on the property. *Brown by Brown v. Marathon Realty, Inc.*, 565 N.Y.S.2d 219, 221 (N.Y. App. Div. 1991). I favor an approach whereby a trier of fact examines the totality of the circumstances to determine whether a landlord had constructive notice that flaking, chipping, or peeling paint in a residence contained lead. Age of the premises is one factor to consider.

¶ 68. Finally, I disagree with the majority's use of the 1978 distinction because the creation of such a distinction is more properly left to the legislature. In *State v. Amoco Oil Co.*, 97 Wis. 2d 226, 259, 293 N.W.2d 487 (1980) (citing *Ferguson v. Skrupa*, 372 U.S. 726, 730–731 (1963)), this court stated:

> The court should not substitute its social and economic beliefs for the judgment of the legislative body. The legislature has broad scope to experiment with solutions to economic problems and has the power to regulate injurious commercial and business practices as long as it does not run afoul of the federal constitution, state constitution, or federal statutes.

In incorporating the 1978 date into its test, the majority is usurping the role of the legislature. With the 1978 date, the majority creates more than a common law

duty—it engages in judicial legislating by substituting its social and economic beliefs for the legislature's judgment. *See Amoco Oil Co.*, 97 Wis. 2d at 259.

¶ 69. In summary, I agree with the mandate that a landlord's duty to test for lead-based paint arises when the landlord knows or should have known that flaking, peeling or chipping paint contains lead. I write only to state my concern with the majority's distinction between residential properties constructed before or after 1978, especially in light of the lack of legal support for that distinction, and the negative ramifications such a line may have on both landlords and tenants who may be victims of lead poisoning. I conclude that the trier of fact should examine all relevant circumstances in each case to determine if a landlord knew or should have known that flaking, chipping or peeling paint on the premises involved contained lead. The duty to test should not be based on the selection of an arbitrary date.

¶ 70. For these reasons, I concur.

¶ 71. I am authorized to state that Justice JON P. WILCOX joins this concurrence.