Steven THOMAS, a Minor, by his Guardian ad Litem, Susan M. Gramling, Plaintiff-Appellant,†

v.

Clinton L. MALLETT, Billie R. Mallett, and Germantown Mutual Insurance Co., Defendants,

AMERICAN CYANAMID Co., Atlantic Richfield Co., E.I. DuPont De Nemours and Co., NL Industries, Inc., SCM Chemicals, Inc., Sherwin-Williams Co., and ConAgra Grocery Products Co., Defendants-Respondents.

Court of Appeals

*No. 03–1528. Submitted on briefs May 4, 2002.—Decided June 15, 2004.*

2004 WI App 131

(Also reported in 685 N.W.2d 791.)

† Petition to review granted 9-16-04.

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Peter G. Earle* and *Ellen R. Brostrom* of *Earle & Brostrom, LLP*, Milwaukee and *Robert J. McConnell* and *Fidelma Fitzpatrick* of *Motley Rice, LLC*, Providence, Rhode Island.

On behalf of the defendants-respondents, the cause was submitted on the brief of *Michael B. Apfeld* and *David G. Peterson* of *Godfrey & Kahn, S.C.*, Milwaukee and *Philip H. Curtis* and *Bruce R. Kelly* of *Arnold & Porter*, New York, New York.

An *amici curiae* brief was filed on behalf of Service Employees International Union, Wisconsin Commission on Occupational Safety and Health, Repairers of the Breach, Wisconsin Citizen Action, Wisconsin Education Association Council and its affiliate, Milwaukee Education Association, and Wisconsin Federation of Nurses

and Health Professionals by *Lynn M. Novotnak* of *First, Blondis, Albrecht & Novotnak, S.C.,* Milwaukee.

Before Wedemeyer, P.J., Fine and Brown, JJ.

¶ 1. FINE, J. Steven Thomas, a minor born in 1990, appeals by his guardian *ad litem* from the trial court's order granting summary judgment dismissing his case against American Cyanamid Co., Atlantic Richfield Co., E.I. DuPont De Nemours and Co., NL Industries, Inc., SCM Chemicals, Inc., Sherwin-Williams Co., and ConAgra Grocery Products Co.[1] Thomas suffers from serious neurological disorders, which he claims were caused by his ingestion of paint pigmented with white lead carbonate. He blames the paint in two homes where he spent his early years: houses built in 1900 and 1905. Although he has recovered settlements from the houses' owners, he also seeks recovery from the defendant companies, which made white lead carbonate and, he contends, conspired over the years to obscure and conceal lead's dangers. He cannot, however, determine which of the defendant companies, if any, made the white lead carbonate in the paint he took into his system. Accordingly, he has sued them all under the "risk contribution" theory of liability adopted by *Collins v. Eli Lilly Co.*, 116 Wis. 2d 166, 191–195, 342 N.W.2d 37, 49–51 (1984), *cert. denied sub nom. E.R. Squibb & Sons, Inc. v. Collins*, 469 U.S. 826, for diethylstilbestrol claims. Alternatively, he contends that his claims

---

[1] We thank Service Employees International Union, Wisconsin Commission on Occupational Safety and Health, Repairers of the Breach, Wisconsin Citizen Action, Wisconsin Education Association Council and its affiliate, Milwaukee Education Association, and Wisconsin Federation of Nurses and Health Professionals for their combined Amici Curiae brief.

against the defendant companies pass summary-judgment muster on "conspiracy" and "enterprise liability" theories. The trial court declined to extend *Collins* to this case, and also rejected Thomas's other theories of recovery. Our review is *de novo. See Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315–317, 401 N.W.2d 816, 820–821 (1987). We affirm.

1. *Collins*.

¶ 2. The plaintiff in *Collins* had vaginal cancer that was caused by her mother's taking diethylstilbestrol during her pregnancy. *Collins*, 116 Wis. 2d at 173–174, 342 N.W.2d at 41. Thus, the plaintiff in that case had a potential negligence claim against the drug's manufacturer and a potential strict-liability claim against the manufacturer and those who sold the drug to her mother.[2] In order to successfully pursue these claims under traditional tort law, however, she had to

---

[2] "A negligence action requires the proof of four elements: '(1) A duty of care on the part of the defendant; (2) a breach of that duty; (3) a causal connection between the conduct and the injury; and (4) an actual loss or damage as a result of the injury.' " *Morden v. Continental AG*, 2000 WI 51, ¶ 45, 235 Wis. 2d 325, 355, 611 N.W.2d 659, 673 (quoted source omitted). A plaintiff asserting a strict-liability claim "must prove (1) that the product was in defective condition when it left the possession or control of the seller, (2) that it was unreasonably dangerous to the user or consumer, (3) that the defect was a cause (a substantial factor) of the plaintiff's injuries or damages, (4) that the seller engaged in the business of selling such product or, put negatively, that this is not an isolated or infrequent transaction not related to the principal business of the seller, and (5) that the product was one which the seller expected to and did reach the user or consumer without substantial change in the condition it was when he sold it." *Dippel v. Sciano*, 37 Wis. 2d 443, 460, 155 N.W.2d 55, 63 (1967).

first identify the manufacturer or seller of the specific pills her mother took, and this she was unable to do. *Id.*, 116 Wis. 2d at 174, 180, 342 N.W.2d at 41, 44. Faced with the certainty that the woman injured by her mother's use of diethylstilbestrol would have *no* "remedy at law for her injuries" unless the traditional identification-rule was modified, *id.*, 116 Wis. 2d at 182, 342 N.W.2d at 45, *Collins* relied on article I, section 9 of the Wisconsin Constitution ("Every person is entitled to a certain remedy in the laws for all injuries, or wrongs which he may receive in his person, property, or character."), and decided to "fashion[] a method of recovery for the [diethylstilbestrol] case which will deviate from traditional notions of tort law." *Collins*, 116 Wis. 2d at 181, 342 N.W.2d at 45.

¶ 3. As noted, the "deviation" was *Collins*'s adoption of the "risk contribution" theory of liability for diethylstilbestrol cases. This relaxed the plaintiffs' burden in those cases to identify the manufacturer or seller responsible for the specific diethylstilbestrol pills their mothers took. Under this theory, the diethylstilbestrol plaintiff needed only to show that a "defendant drug company produced or marketed the type of [diethylstilbestrol] taken by [her] mother" in connection with her claims for both negligence and strict-liability. *Id.*, 116 Wis. 2d at 195, 196, 342 N.W.2d at 51.

¶ 4. As Thomas points out in his extensive submissions, and, for the purposes of this appeal, assuming their verity, this case and *Collins* share, for many of the same reasons, the inability of the plaintiff to identify those who made and sold the specific substance alleged to have caused injury. Thus, in both *Collins* and here the substances produced or sold by one company are, as material to the possibility of tracing the manufacturer or seller, essentially the same as that produced or sold

by the others. *See id.*, 116 Wis. 2d at 180, 342 N.W.2d at 44. Additionally, both the diethylstilbestrol alleged to have caused the plaintiff's vaginal cancer in *Collins*, and the white lead carbonate alleged to have caused Thomas's neurological disorders were made and sold by many companies long before the injury, making it impossible to trace specific manufacturers or sellers to the particular injury-causing product. *See id.*, 116 Wis. 2d at 179–181, 342 N.W.2d at 44.

¶ 5. The inability of an injured plaintiff to trace and identify the manufacturer or seller responsible for the specific substance causing injury, however, was not the ultimate *reason Collins* fashioned the "risk contribution" theory of liability for diethylstilbestrol cases, although that inability was a necessary predicate. As we have seen, the diethylstilbestrol plaintiff would have been without *any* remedy if the traditional rule was not modified. *Collins* explained:

> We are faced with a choice of either fashioning a method of recovery for the [diethylstilbestrol] case which will deviate from traditional notions of tort law, or permitting possibly negligent defendants to escape liability to an innocent, injured plaintiff. In the interests of justice and fundamental fairness, we choose to follow the former alternative.

*Id.*, 116 Wis. 2d at 181, 342 N.W.2d at 45. There is no such dilemma here.

¶ 6. As we have seen, article I, section 9 of the Wisconsin Constitution, as material here, preserves to "[e]very person" "a certain remedy in the laws for all injuries, or wrongs which he may receive in his person." The clause, however, also conditions this guarantee to considerations of existing law. Thus, it reads in full:

> Every person is entitled to a certain remedy in the laws for all injuries, or wrongs which he may receive in his person, property, or character; he ought to obtain justice freely, and without being obliged to purchase it, completely and without denial, promptly and without delay, *conformably to the laws.*

(Emphasis added.) Accordingly, article I, section 9, has never been interpreted to " 'entitle Wisconsin litigants to the exact remedy they desire.' " *Wiener v. J.C. Penney Co.*, 65 Wis. 2d 139, 150, 222 N.W.2d 149, 155 (1974) (quoted source omitted). To the contrary, the clause preserves to aggrieved persons only " 'their day in court.' " *Ibid.* (quoted source omitted). Indeed, the clause "confers no legal rights." *Aicher v. Wisconsin Patients Comp. Fund*, 2000 WI 98, ¶ 43, 237 Wis. 2d 99, 122, 613 N.W.2d 849, 863. "Rather, art. I, § 9 applies only when a prospective litigant seeks a remedy for an already existing right." *Ibid.*

¶ 7. Here, unlike the situation in *Collins*, Thomas had "an already existing right"—a remedy for his injuries; as noted, he filed and then settled an action against the owner of one of the houses, and settled his claims against the other owner without filing suit. Indeed, an owner of a house "constructed prior to 1978 is under a common law duty to test for lead paint when the landlord knows or, in the use of ordinary care, should have known that the residence contained peeling or chipping paint." *Antwaun A. v. Heritage Mut. Ins. Co.*, 228 Wis. 2d 44, 55, 596 N.W.2d 456, 461 (1999). Moreover, "by 1989, the dangers of lead paint in residential housing was [*sic*] . . . extensively known." *Id.*, 228 Wis. 2d at 62, 596 N.W.2d at 464. Although undoubtedly Thomas would like to have additional "deep pockets" to plumb, on top of the approximately

$325,000 he received in settlement from both owners, he is not entitled " 'to the exact remedy' " he might prefer. *See Wiener*, 65 Wis. 2d at 150, 222 N.W.2d at 155 (quoted source omitted). Accordingly, expansion of *Collins*'s "risk contribution" theory of liability to producers and sellers of white lead carbonate is neither necessary nor appropriate.

2. *Conspiracy.*

¶ 8. A civil conspiracy in Wisconsin is " 'a combination of two or more persons by some concerted action to accomplish some unlawful purpose or to accomplish by unlawful means some purpose not in itself unlawful.' " *Onderdonk v. Lamb*, 79 Wis. 2d 241, 246, 255 N.W.2d 507, 509 (1977) (quoted source omitted). "To state a cause of action for civil conspiracy, the complaint must allege: (1) The formation and operation of the conspiracy; (2) the wrongful act or acts done pursuant thereto; and (3) the damage resulting from such act or acts." *Id.*, 79 Wis. 2d at 247, 255 N.W.2d at 510.

¶ 9. Thomas has marshalled extensive documentation that supports his contentions that at least some of the defendant companies and their trade association (which was named by Thomas as a defendant but was dismissed following its seeking bankruptcy protection) acted in concert to at least minimize the perceived dangers of white lead carbonate. If this were all that was necessary to support a claim for civil conspiracy, we would have no hesitation in concluding that there were genuine issues of material fact precluding summary judgment dismissing that claim. *See* WIS. STAT. RULE 802.08(2); *Edwardson v. American Family Mut. Ins.*

*Co.*, 223 Wis. 2d 754, 762, 589 N.W.2d 436, 439 (Ct. App. 1998) ("An agreement or cooperation toward the attainment of the illegal objective is a necessary element of a conspiracy."). But, as noted, a successful claim for civil conspiracy also requires that the plaintiff be able to prove "damage *resulting*" from the acts alleged to comprise the conspiracy. *Onderdonk*, 79 Wis. 2d at 247, 255 N.W.2d at 510 (emphasis added). Thus, in order to survive summary judgment on his civil conspiracy claim, Thomas was required to establish that there was at least a genuine issue of fact on the "resulting damage" element by submitting evidentiary material "set-[ting] forth specific facts," WIS. STAT. RULE 802.08(3), material to that element. *Transportation Ins. Co. v. Hunzinger Constr. Co.*, 179 Wis. 2d 281, 290–292, 507 N.W.2d 136, 139–140 (Ct. App. 1993). This he did not do.

¶ 10. In order to sustain his summary-judgment burden in connection with the "resulting damage" element of a claim for civil conspiracy, Thomas had to show that there is at least a genuine issue of material fact that the alleged concerted action about which he complains was a "substantial factor" in producing his injuries. *See Morden v. Continental AG*, 2000 WI 51, ¶ 45, 235 Wis. 2d 325, 355, 611 N.W.2d 659, 673. " 'The phrase 'substantial factor' denotes that the defendant's conduct has such an effect in producing the harm as to lead the trier of fact, as a reasonable person, to regard it as a cause, using that word in the popular sense.' " *Zielinski v. A.P. Green Indus., Inc.*, 2003 WI App 85, ¶ 16, 263 Wis. 2d 294, 306, 661 N.W.2d 491, 496 (quoted source omitted). There may, of course, be more than one substantial factor causing injury. *Morgan v. Pennsylvania Gen. Ins. Co.*, 87 Wis. 2d 723, 735, 275 N.W.2d 660,

666 (1979). But in order for something to be a "substantial factor" there must be more than " '[a] mere possibility' " that the claimed damages resulted from the acts under consideration. *Zielinski*, 2003 WI App 85, ¶ 16, 263 Wis. 2d at 306, 661 N.W.2d at 497 (quoted source omitted).

¶ 11. Unlike the situation in *Collins*, where diethylstilbestrol was dangerous to the daughters of some of the women who took the drug during their pregnancy even though the drug was used precisely as it was intended to be used, Thomas points to nothing in the extensive summary judgment record that white lead carbonate was dangerous as a paint pigment if the paint was applied and maintained properly. Further, the defendant companies are being sued as producers of white lead carbonate and not the paint in which the substance was used as a pigment. Thus, the focus has to be on the white-lead-carbonate pigment they produced or sold, and not the paint base to which the pigment was added, perhaps in different formulations from one paint product to another. Significantly, Thomas's claimed injuries stem from what he admits was his ingestion of peeling and flaking paint chips and dust. The only persons whose acts he contends caused the white lead carbonate to become ingestible are the landlords with whom he has settled.

¶ 12. As we have seen, no one disputes that in the early 1990s, when the landlords did what Thomas says they did, lead was a known danger despite earlier attempts by the white-lead-carbonate industry to downplay those dangers. *See Antwaun A.*, 228 Wis. 2d at 59–62, 596 N.W.2d at 463–464 ("by 1989, the dangers of lead paint in residential housing was [*sic*] . . . extensively known"). Indeed, Thomas's amended complaint recognizes that "the use of [lead in paint] was banned in

the United States in 1978." It was banned in Wisconsin, effective April 30, 1980. Laws of 1979, ch. 221, § 657u. Moreover, as Thomas reminds us, the dangers of lead generally were known by the ancient Greeks. *See Peace v. Northwestern Nat'l Ins. Co.*, 228 Wis. 2d 106, 138 n.19, 596 N.W.2d 429, 443 n.19 (1999).

¶ 13. Assuming for the purposes of this appeal that the defendant companies conspired as Thomas contends that they did (and that thus the dangers of lead-based paint were hidden for more years than they would have been absent the alleged conspiracy) Thomas has not presented any "specific facts" as required by WIS. STAT. RULE 802.08(3) that even tend to demonstrate that if there were no such conspiracy:

> (1) white lead carbonate as a paint pigment would have been banned so that no one, from 1900 and 1905 respectively to 1978, would have used lead-based paint inside the two houses in which he lived; and

> (2) his landlords and their predecessors would have properly maintained that paint.

Indeed, in connection with the latter aspect, the undisputed summary-judgment record shows that both landlords allowed the paint to remain in a deteriorated state and improperly attempted to remediate the resulting health risk even though the dangers of improperly maintained lead-based paint had then been known beyond doubt for more than a decade. Thus, Thomas has not presented a triable issue of whether he suffered any damages "resulting" from the alleged civil conspiracy. Simply put, he has not shown causal reliance by anyone on what the defendant companies may have done. Significantly, Thomas's amended complaint asserted claims against the defendant companies for

negligence and intentional misrepresentation in connection with the various claims of safety that they are alleged to have made over the years. The trial court dismissed those claims because Thomas could not show reliance. He has not appealed from this aspect of the trial court's dismissal. Unlike the situation in *Tanner v. Shoupe*, 228 Wis. 2d 357, 596 N.W.2d 805 (Ct. App. 1999), upon which Thomas relies, where a warning to not pound on automobile-battery vent caps would have "alert[ed] a prior user of the battery not to pound on the vent caps," *id.*, 228 Wis. 2d at 381, 596 N.W.2d at 818 (emphasis omitted), thus preventing injury to the subsequent-user plaintiff, there is nothing here beyond mere speculation that, given all the factors that comprise a governmental decision to either ban or discourage the use of a product in this country, the alleged concerted action by the defendant companies was a substantial factor that contributed to either the use of lead-based paint in the houses from 1900 and 1905 until 1978, or its faulty maintenance from 1900 and 1905 through when Thomas lived in the houses some ninety years later. The trial court did not err in dismissing Thomas's civil conspiracy claim.

3. *Enterprise Liability.*

¶ 14. Thomas also contends that the trial court erred in granting summary judgment dismissing his enterprise-liability claims against the defendant companies. Again, our review of the trial court's decision is *de novo.*

¶ 15. As explained by *Collins*, enterprise-liability is a theory that, like the "risk contribution" theory

adopted by *Collins*, is designed to relieve an injured plaintiff of the burden of having to designate the entity or person who caused his or her injuries. "Under enterprise liability theory, it is the industry-wide standard that is the cause of injury, and each defendant that participates in perpetuating and using the inadequate standard has contributed to and is liable for the plaintiff's injury." *Collins*, 116 Wis. 2d at 186, 342 N.W.2d at 47. As *Collins* relates, the enterprise-liability theory "was first suggested in *Hall v. E.I. Du Pont De Nemours & Co., Inc.*, 345 F. Supp. 353 (E.D.N.Y. 1972)." *Collins*, 116 Wis. 2d at 186, 342 N.W.2d at 47.

¶ 16. In *Hall*, children in various parts of the country were injured by defective blasting caps that were alleged to have been "designed and manufactured jointly or severally by the six corporate defendants or by other unnamed manufacturers, and by their trade association." *Hall*, 345 F. Supp. at 359. *Hall* posited three considerations that might support joint and several liability of those in an industry, when a plaintiff is unable to identify who caused his or her injuries:

> First, plaintiffs can prove the existence of an explicit agreement and joint action among the defendants with regard to warnings and other safety features-the classic "concert of action." Second, plaintiffs can submit evidence of defendants' parallel behavior sufficient to support an inference of tacit agreement or cooperation. Such cooperation has the same effects as overt joint action, and is subject to joint liability for the same reasons. Third, plaintiffs can submit evidence that defendants, acting independently, adhered to an industry-wide standard or custom with regard to the safety features of blasting caps. Regardless of whether such evidence is sufficient to support an inference of tacit agreement, it is still relevant to the question of joint control of risk. The dynamics of market competi-

tion frequently result in explicit or implicit safety standards, codes, and practices which are widely adhered to in an entire industry.

*Id.*, 345 F. Supp. at 373–374 (citations and paragraphing omitted). *Collins* rejected the *Hall* approach because unlike the blasting-cap industry in *Hall*, "perhaps hundreds of potential defendant drug companies" made or sold diethylstilbestrol. *Collins*, 116 Wis. 2d at 186, 342 N.W.2d at 47. As Thomas points out, the situation here is different—the white-lead-carbonate industry was smaller and more cohesive than was the diethylstilbestrol industry discussed in *Collins*. Thus, *Collins*'s reason for not adopting the enterprise-liability theory in an attempt to give some remedy for the vaginal-cancer wrong suffered by women whose mothers took diethylstilbestrol does not apply here. There are, however, two other reasons why the enterprise-liability theory does not save Thomas's claims against the defendant companies.

¶ 17. First, as we have seen, unlike the blasting caps in *Hall*, there is no evidence in the record to which Thomas has pointed that indicates that white lead carbonate either was negligently made, or was dangerously defective if the paint it pigmented was applied and maintained appropriately. Additionally, as we have already discussed in ¶ 13 of this opinion, Thomas's contention that the white-lead-carbonate industry obscured and concealed the dangers of misapplied or poorly maintained lead-based paint falters on his inability to show resulting causation.

¶ 18. Second, unlike the situation in *Collins* where, as already discussed, there was a need under article I, section 9 of the Wisconsin Constitution to find *some* theory that would permit the "innocent, injured

plaintiff" to recover against "possibly negligent defendants," *Collins*, 116 Wis. 2d at 181, 342 N.W.2d at 45, Thomas had, and used, "a remedy at law for [his] injuries." *Id.*, 116 Wis. 2d at 182, 342 N.W.2d at 45. That it might not be the remedy he wants does not alter the calculus. *See Wiener*, 65 Wis. 2d at 150, 222 N.W.2d at 155 (Article I, section 9 does not " 'entitle Wisconsin litigants to the exact remedy they desire.' ") (quoted source omitted). Adoption of the "enterprise liability" theory in this case is not warranted.

¶ 19. The trial court did not err in granting summary judgment to the defendant companies dismissing Thomas's claims against them. Accordingly, we affirm.

*By the Court.*—Order affirmed.

¶ 20. BROWN, J. (*concurring*). The issue before us is whether Wisconsin's courts should extend the risk contribution theory of market share liability announced in *Collins v. Eli Lilly Co.*, 116 Wis. 2d 166, 342 N.W.2d 37 (1984), to litigation against lead paint pigment manufacturers. In my view, the only court that may extend the law in this fashion is our supreme court. Because the court of appeals is mainly an error-correcting court, we are duty-bound to apply the law as it presently exists. And presently, the acceptance of risk contribution theory in Wisconsin is limited to cases involving the use by pregnant women of a drug known as DES. For this reason, I concur in the result.

¶ 21. I do not concur with the reasoning employed by the majority. Distilled to its essence, the majority's rationale is that because plaintiff's lead poisoning injury was addressed in a suit against the landlords, he received the benefit of *a* remedy for his injury and is not entitled to anything more. The majority apparently interprets article 1, § 9 of our state constitution to ask two things:

Was there an injury? If so, did the plaintiff obtain redress in the courts for that injury. If so, the plaintiff has had his day in court and is not entitled to "plumb" for deep pockets against any other alleged wrongdoers.

¶ 22. I disagree with this interpretation as it overlooks the unambiguous wording of article 1, § 9. The plain meaning of this section is that every person is entitled to a certain remedy for "all injuries *or* wrongs which he may receive in his person." [Emphasis added.] Notice that the wording is in the disjunctive. The way I read this clause, it means that even assuming only one injury, if that injury was brought about by separate wrongs against the person, that person is entitled to a remedy for each "wrong."

¶ 23. Take, for example, *Anwaun A. ex rel. Muwonge v. Heritage Mutual Insurance, Co.*, 228 Wis. 2d 44, 55, 596 N.W.2d 456 (1999). There, our supreme court ruled that "a landlord of a house constructed prior to 1978 is under a common law duty to test for lead paint when the landlord knows, or in the use of ordinary care, should have known that the residence contained peeling or chipping paint." This duty was based on the belief that, by the late 1980's, information about the dangers of lead-based paint was so widely available that landlords should be presumed to be aware of the risks. A landlord who ignores this foreseeable risk and allowed peeling or chipping paint which a small child could ingest, has committed a "wrong" against that child.

¶ 24. But who sold the idea of putting lead paint into our nation's homes and apartments in the first place? The plaintiff has presented a panoply of evidence that the lead paint industry knew since the early 1800's that lead paint could seriously harm young children. Yet, it not only continued to sell lead based paint, it

allegedly, blatantly lied and claimed in advertisements that the paint was "healthful" to people. The allegation is that it committed a wrong. As I read our constitution, there is a remedy for every wrong and that presupposes that there is a wrongdoer behind that wrong. I have never seen a case that insulates a wrongdoer from being exposed to lawsuit just because there exists a remedy against another wrongdoer.

¶ 25. The majority relies on *Wiener v. J.C. Penney Co.*, 65 Wis. 2d 139, 150, 222 N.W.2d 149 (1974) as support. But *Wiener* is inapposite. There, the legislature had promulgated a statute fashioning exclusive out-of-court procedures to remedy excess interest rates charged by retail sellers. The plaintiffs in that case claimed that the procedures were inadequate and sued. The supreme court logically determined that just because the kind of remedy, an administrative procedure, was not to the plaintiff's liking, that did not mean that the plaintiffs were without a remedy. *Wiener* never touched upon the question of whether, if a plaintiff has a remedy against one party for a wrong committed by that party, he or she has a viable remedy against another party for a different wrong.

¶ 26. I submit that our constitution speaks to the right of our citizenry to pursue wrongdoers if the action exists at common law. This suit is an action for intentional, ordinary and gross negligence. It is certainly recognizable in our common law. I conclude that article 1, § 9 does not avail to the paint manufacturing industry.

¶ 27. I take no stand on whether there are other grounds upon which the paint industry might avoid lawsuit. They have listed many different theories. It is unnecessary for me to go into them here. Suffice it to say, the lead paint industry has not argued that simply

because the plaintiff already has a remedy against the landlords, there is no right to a remedy against them. The industry does claim other reasons why landlords are properly subject to exposure to lawsuit but it should not be similarly exposed. As I earlier stated, whether to adopt one or more of the paint manufacturers' theories is for the supreme court to decide.